DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02 07 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X

UNITED STATES OF AMERICA

      - v. -

STEVEN BROWN,

          Defendant.
----------------------------------------- X

       :   **SUPERSEDING**
       :   **INDICTMENT**

       :   S6 16 Cr. 436

COUNT ONE
(Conspiracy to Commit Wire Fraud)

The Grand Jury charges:

Overview

1.      As set forth more fully below, from in or about 2009

through in or about 2016, STEVEN BROWN, the defendant, and

others, participated in a fraudulent scheme, in which BROWN and

another co-conspirator, James David Williams ("Williams"),

portrayed themselves as experts in the marketing of feature-

length films and documentaries and, along with a second co-

conspirator, Gerald Seppala ("Seppala"), solicited investments

in these films from investors by, among other things, promising

guaranteed returns and shares of the profits, which never

materialized.

2.      In order to solicit these investments, STEVEN BROWN,

the defendant, Williams, and Seppala made material

misrepresentations regarding, among other things, their own

investments in the films and/or funding that they claimed they

had already received from other investors, and used falsified
financial documents to support their claims.

3. STEVEN BROWN, the defendant, and his co-conspirators
solicited millions of dollars from various investors --
including the victims described in further detail below -- to
allegedly help finance the marketing or production of certain
film projects. In reality, however, the money that was received
from these investors was predominantly used to fund other
projects, to pay back other defrauded investors, or to pay the
personal expenses of BROWN, among others.

### The Scheme to Defraud Victim-1

4. In or about 2009, STEVEN BROWN, the defendant, met
with an individual ("Victim-1") regarding a feature-length film
("Film-1") with which Victim-1 was involved. BROWN stated to
Victim-1, in substance and in part, that Williams was a person
who could assist with the distribution of Film-1 and could
commit funds or arrange for funds for the distribution of Film-1
through a company owned by Williams called Legacy Film Crest LLC
("Legacy"). In part as a result of those representations,
Victim-1 and two other investors whom Victim-1 recruited
invested in Film-1.

5. In or about 2009, STEVEN BROWN, the defendant,
solicited Victim-1, including by email and in telephone calls

2

that took place while Victim-1 was located in Manhattan, New York, to invest in a second feature-length film ("Film-2"), and represented to Victim-1 that Victim-1 was guaranteed at least an eight percent return on his investment. BROWN and Williams further informed Victim-1 that they had personally contributed approximately $600,000 collectively towards Film-2, when in truth and in fact, BROWN and Williams had not contributed these funds.

6.     Based in part on these representations, in or about October 2009, Victim-1 sent approximately $200,000 to a bank account held in the name of "Remnants Productions LLC" (the "Remnants Account"). The two signers for the Remnants Account were STEVEN BROWN, the defendant, and an attorney working with BROWN ("Attorney-1"). Prior to Victim-1 depositing the $200,000 into the Remnants Account, the Remnants Account had a balance of approximately $100. In addition, other investors working with Victim-1 also invested in Film-2 and transferred funds into the Remnants Account.

7.     While Film-2 was still in production, STEVEN BROWN, the defendant, informed Victim-1 that certain state tax credit money would be received in connection Film-2 and would be used, at least in part, to pay back investors in Film-2. Subsequently, Victim-1 repeatedly asked BROWN and others

3

involved with the production of Film-2 about the status of the tax credit money. Victim-1 never received any of the tax credit money, despite BROWN's promises that that money would be distributed to investors in Film-2.

8.    With production of Film-2 still not complete, STEVEN BROWN, the defendant, falsely told Victim-1 that if Victim-1 invested an additional $65,000 in Film-2, BROWN would invest $65,000 himself, thereby allowing for the completion of the production of Film-2. In reliance upon that representation, among other things, Victim-1 transferred approximately $65,000 via wire transfer to the Remnants Account on or about December 3, 2010. At the time of the transfer, the balance in the Remnants Account was approximately $239. Shortly thereafter, on or about December 3, 2010, $15,000 was transferred from the Remnants Account to the bank account of another company controlled by BROWN known as Cineglobe, on which BROWN was the sole signer. Thereafter, BROWN spent the $15,000 in funds on various expenses not associated with the production of Film-2.

9.    While STEVEN BROWN, the defendant, represented to Victim-1 that BROWN would invest $65,000 of BROWN's funds into Film-2, BROWN never deposited any such funds into the Remnants Account.

4

10. The funds that Victim-1 invested in Film-2 were never returned to Victim-1, despite his repeated requests for their return. In addition, Victim-1 never received any return on the investment that he had made in Film-2.

## The Scheme to Defraud Victim-2

11. From in or about April 2013 through in or about January 2014, another individual ("Victim-2") was fraudulently induced to provide approximately $11 million to STEVEN BROWN, the defendant, Williams, and Seppala, or to companies that they controlled, purportedly to finance various film projects. In reality, most of the money provided by Victim-2 was not used for the purpose for which it was solicited, and was instead diverted for the personal use of BROWN, Williams, and Seppala.

## *The Scheme to Defraud Victim-2 Involving Film-3*

12. In or about April 2013, Williams, and Seppala were first introduced to Victim-2 through a third party. Following that introduction, Williams, and Seppala discussed with Victim-2 the possibility of Victim-2 investing in a feature-length documentary ("Film-3"). They explained to Victim-1 that STEVEN BROWN, the defendant, and Seppala were the producers of Film-3 and that a company managed by Seppala called Visions LLC ("Visions") would serve as the primary production and financing vehicle for Film-3. Victim-2 was further informed that he would

5

be among a class of shareholders with a right to recoup their investment first and would receive a pro-rata share of Film-3's profits.

13. In or about April 2013, during a conference call with Victim-2, STEVEN BROWN, the defendant, Williams, and Seppala further falsely represented to Victim-2 that Williams planned to invest $500,000 in Film-3. In truth and in fact, and unbeknownst to Victim-2, BROWN, Williams, and Seppala knew that Williams did not intend to invest $500,000 in Film-3.

14. In order to convince Victim-2 to invest in Film-3, Williams, with the knowledge of STEVEN BROWN, the defendant, and Seppala, prepared false financial statements showing that Williams had invested $500,000 in Film-3, when in truth and in fact, Williams had not invested these funds. On or about April 15, 2013, Seppala sent an email to Victim-2 attaching an email from Williams that contained a purported confirmation of a wire transfer of $500,000 from a bank account controlled by Williams into a Visions bank account (the "Visions Account"). Seppala thereafter forwarded a copy of that email to Williams and BROWN. As further confirmation of Williams' investment in Film-3, Seppala also emailed Victim-2's attorney a purported screenshot of an online statement for the Visions Account, which showed a balance of approximately $531,610.12 in the Visions Account, as

6

well as an acknowledgement, signed by Seppala, that Visions had
already received Williams' $500,000 investment, none of which
was true.

15.    Based in part on these representations, on or about
April 26, 2013, Victim-2 caused $500,000 to be wired to the
Visions Account.

16.    Shortly after Victim-2 transferred $500,000 to the
Visions Account, STEVEN BROWN, the defendant, Williams and
Seppala diverted a substantial portion of these funds to pay for
various expenses unrelated to Film-3. In particular, BROWN used
a portion of these funds to obtain an ownership interest in a
real estate property located in Santa Monica, California (the
"Santa Monica Property") that was owned by an entertainment
agent associated with BROWN ("Agent-1"), and was unrelated to
Film-3.

## The Scheme to Defraud Victim-2 Involving Film-4

17.    In or about June 2013, Williams approached Victim-2
with an opportunity to invest in another feature-length film
("Film-4").  Specifically, Williams represented that Williams
had an agreement with the producer of Film-4 for Williams to
make a $10 million loan for the marketing of Film-4. Williams
also represented that this loan would be repaid out of net
revenues from Film-4 prior to the repayment of other investors,

7

and that holders of the loan would be given a share of Film-4's net profits.

18.   Williams falsely told Victim-2 that Williams' company, Luxe One, would be making the loan and that Williams had already transferred $2 million of his own money in order to personally participate in the investment.  In addition, Williams falsely told Victim-2 that Williams had already secured an additional $6 million from a company that was a collection of individuals with whom Williams claimed to have made such investments in the past (the "Investing Entity").  Williams then asked Victim-2 to invest $2 million in Film-4.

19.   In order to persuade Victim-2 to invest in Film-4, STEVEN BROWN, the defendant, and Williams agreed that Williams would prepare false financial documents showing that Luxe One and others had invested several million dollars in Film-4.  With BROWN's knowledge, Williams prepared these false financial documents and provided them to Victim-2.

20.   Based in part on these representations, in or about July 3, 2013, Victim-2 caused $2 million to be sent via wire transfer to a Luxe One bank account ("Luxe One Account-1").

21.   Shortly after Victim-2 transferred $2 million to Luxe One Account-1, a substantial portion of these funds were diverted to pay for various expenses unrelated to Film-4,

8

including the expenses of STEVEN BROWN, the defendant. For example, from on or about July 8, 2013 through on or about August 30, 2013, approximately $531,000 was transferred from Luxe One Account-1 to another Luxe One bank account ("Luxe One Account-2"), for which both BROWN and Williams were signers. Thereafter, between on or about July 12 and September 4, 2013, BROWN withdrew at least approximately $14,000 from this account.

22. In or about November 2013, Williams, in consultation with STEVEN BROWN, the defendant, approached Victim-2 with an opportunity to invest additional money in Film-4 through Luxe One, and explained that the company producing Film-4 (the "Production Company") was looking to increase the investment in Film-4 for marketing expenses and "finishing funds." Williams falsely told Victim-2 that he was investing an additional $4 million, and that the Investing Entity was doing the same. Williams solicited an additional $4 million from Victim-2 for Film-4.

23. Prior to investing additional money in Film-4, Victim-2's attorney asked Williams to confirm that Williams and the Investing Entity had each already transferred $4 million respectively; that a total of $18 million had already been collected; and that the so-called "finishing funds" had already been paid, permitting the completion of Film-4. In response,

9

and in coordination with BROWN and with BROWN's knowledge, Williams sent Victim-2's attorney in Manhattan, New York a screenshot of what purported to be a statement from Luxe One Account-1. The falsified account statement showed that, as of December 17, 2013, Luxe One Account-1 had a balance of $18,014,609.46. A few days later, Williams sent Victim-2's attorney copies of what purported to be cancelled checks from Luxe One Account-1 representing the $1.75 million in so-called "finishing funds" that Luxe One purportedly had paid to the Production Company.

24. Based in part on these representations, on or about January 2, 2014, Victim-2 caused an additional $4 million to be transferred to Luxe One Account-1.

25. In reality, neither Williams nor the Investing Entity had invested any money into Luxe One Account-1 prior to Victim-2's transfer of the additional $4 million investment to that account on or about January 2, 2014. Contrary to the representations and documents provided to Victim-2, on December 17, 2013, the actual balance of Luxe One Account-1 was approximately $112,945.09, and as of on or about January 2, 2014, there was no record of the "finishing funds" having been provided to Luxe One.

10

*The Scheme to Defraud Victim-2 Involving Film-5*

26.   In or about September 2013, Williams approached
Victim-2 with an opportunity to invest in the marketing of a
third movie ("Film-5"). Williams and Victim-2's attorney agreed
that Victim-2 would invest in Film-5 by transferring funds to
Moment Factory, LLC ("Moment Factory"), a company incorporated
by Williams. Williams falsely told Victim-2 that Williams had
already transferred $2 million of his own money to Moment
Factory and sought an additional $2 million from Victim-2. In
the course of these discussions, Williams emailed Victim-2 what
purported to be a screenshot of a statement from the Moment
Factory bank account (the "Moment Factory Account")
demonstrating that the Moment Factory Account had a balance of
$1,903,150.24, which allegedly represented what remained from
Williams' $2 million investment.

27.   Based in part on these representations, on or about
October 30, 2013, Victim-2 caused $2 million to be sent via wire
transfer to the Moment Factory Account.

28.   In truth and in fact, there was no money in the Moment
Factory Account on the date that Williams sent Victim-2 the
screenshot of the account statement and, indeed, that account
never held any funds until Victim-2 transferred $2 million into
the Moment Factory Account.

11

29. Following Victim-2's transfer of the $2 million to the Moment Factory Account, STEVEN BROWN, the defendant, and Williams diverted a substantial portion of the funds to pay for various expenses unrelated to Film-5, including the expenses of STEVEN BROWN, the defendant.

## Victim-2 Demands the Return of His Funds

30. Throughout the winter and spring of 2014, Victim-2, through his attorney and accountant, continually requested additional information on Luxe One and Moment Factory. In partial response to this request, Victim-2 was sent what purported to be financial statements for Luxe One. These financial statements contained discrepancies with prior financial statements for Luxe One accounts that had previously been furnished to Victim-2, including different account balances.

31. Based in part on these discrepancies, Victim-2 asked STEVEN BROWN, the defendant, and Williams to return Victim-2's investment. Despite numerous conversations and multiple meetings between BROWN and Victim-2, neither BROWN nor Williams returned Victim-2's money. During one of those meetings, BROWN and Williams showed Victim-2 a screenshot of a bank account in order to allay Victim-2's concerns. In truth and in fact, the

12

screenshot shown to Victim-2 was fake and did not accurately reflect the true balance in the aforementioned bank account..

## The Scheme to Defraud Victim-3

32. In or about April 2014, STEVEN BROWN, the defendant, and Williams approached another individual ("Victim-3") about the possibility of investing in a feature-length film ("Film-6"). Victim-2 agreed to invest $500,000 in the production of Film-6 based on misrepresentations as to how that money would be used and based on misrepresentations regarding what funds would be or already had been contributed by BROWN, Williams, and other investors.

33. In or around September 2014, Victim-3 met with STEVEN BROWN, the defendant, and Williams. During that meeting, BROWN and Williams falsely represented to Victim-3 that they would make a substantial investment in Film-6. BROWN and Williams proposed that Victim-3 provide $500,000, which would be fully guaranteed by a company called Woodlawn Holdings ("Woodlawn"). Victim-3 would be required to keep the money in the film for at least six months, then, within 120 days of the end of the sixth month, Victim-3 would be eligible to exercise the guarantee with Woodlawn and be repaid the $500,000, plus an additional 15%.

34. In or about September 2014, STEVEN BROWN, the defendant, and Williams falsely told Victim-3 that, even if

13

Victim-3 exercised the guarantee with Woodlawn, Victim-3 would still receive 2.5% of the film's profits. Williams indicated that Victim-3's investment should be sent to Plainfield Pass, LLC ("Plainfield Pass"), at a Plainfield Pass bank account (the "Plainfield Account").

35. Prior to investing in Film-6, Victim-3's attorney asked STEVEN BROWN, the defendant, and Williams to provide additional information on Plainfield Pass and Woodlawn and to confirm that the $3.5 million had already been received. In response, Williams, copying BROWN, sent an email to Victim-3, attaching what purported to be a screenshot of the most current statement from the Plainfield Account (the "Plainfield Account Statement").

36. In addition, STEVEN BROWN, the defendant, sent an email to Victim-3 attaching what purported to be a current bank statement from the relevant account (the "Woodlawn Account") at Woodlawn (the "Woodlawn Account Statement"), as well as an email that purported to come from a "Managing Member" of Woodlawn ("Individual-1"), guaranteeing Victim-3's investment. The Plainfield Account Statement reflected a current balance of $3,500,200.07 in the Plainfield Account, while the Woodlawn Account Statement showed that the Woodlawn Account held more than $4 million.

14

37. Based in part on these representations, on or about September 12, 2014, Victim-3 wired $500,000 to the Plainfield Account.

38. In or about May 2015, Victim-3 contacted STEVEN BROWN, the defendant, and asked BROWN to account for Victim-3's funds. When BROWN told Victim-3 that Victim-3's money was being used for a film other than Film-6, Victim-3 attempted to exercise his option under the Woodlawn guarantee to receive the return of the invested funds, plus interest.

39. After not being paid for several months, Victim-3 contacted Woodlawn to inquire about the status of the guarantee. A representative of Woodlawn told Victim-3 that Woodlawn had no knowledge of STEVEN BROWN, the defendant, Williams, Plainfield Pass or Individual-1.

40. True and accurate records obtained directly from the banks where the Plainfield Account and the Woodlawn Account were held confirm that STEVEN BROWN, the defendant, and Williams made material representations to Victim-2 and falsified business records in order to induce Victim-3 to invest in Film-6. For example:

a. The Plainfield Account had a balance of only $500,200, not $3,500,200.07, at the time that Victim-2 transferred the $500,000 into the Plainfield Account.

15

b.    The Woodlawn Account never had $4 million in it and, in fact, no such account existed at the bank indicated on the Woodlawn Account Statement.

### The Scheme to Defraud Victim-4

41.   In or about 2012, Seppala introduced STEVEN BROWN, the defendant, and Williams to another individual ("Victim-4"). Seppala reviewed a screenplay for a feature-length film ("Film-7") drafted by Victim-4, and thereafter informed Victim-4 that he would send the screenplay to BROWN and Williams.

42.   Thereafter, STEVEN BROWN, the defendant, contacted Victim-4 and informed Victim-4 that he was interested in investing in Film-7. BROWN represented that he would invest $75,000 into Film-7 if Victim-4 likewise invested $75,000. BROWN further represented that Victim-4 would be paid back within one year at five percent interest.

43.   Victim-4 agreed and in or about March 2012, at the direction of STEVEN BROWN, the defendant, deposited Victim-4's investment into an account for a company called Highgate Pass (the "Highgate Pass Account"). Records from the Highgate Pass Account, however, show that (1) BROWN never transferred any of his own money into the Highgate Pass Account; (2) on or about March 15, 2012, the day after Victim-4 deposited Victim-4's investment, Williams wired $35,000 of that money into an account

16

controlled by BROWN and $10,000 into an account controlled by Seppala.

44.    After more than approximately one year, with Film-7 still not having begun production, Victim-4 demanded the return of his $75,000 investment from STEVEN BROWN, the defendant, and Seppala. After threatening to file a lawsuit, BROWN, Williams, and Seppala repaid Victim-4 with funds that had been invested by other investors, unbeknownst to those investors and without their authorization.

### The Scheme to Defraud Victim-5 and Victim-6

45.    In or about 2014, a husband and wife ("Victim-5" and "Victim-6") met STEVEN BROWN, the defendant, through a mutual acquaintance. BROWN solicited an investment from Victim-5 and Victim-6 in a feature length film ("Film-8"). BROWN then introduced Victim-5 and Victim-6 to Williams. Williams solicited a $750,000 investment from Victim-5 and Victim-6 in the distribution of Film-8 and further explained to Victim-5 and Victim-6 that an entity Williams controlled called Panda Media Fund LLC ("Panda") had already invested $3 to $4 million into the distribution of Film-8. Williams told Victim-5 and Victim-6 that they would receive a 15% return on their investment.

46.    Based in part on these representations, Victim-5 and Victim-6 wired approximately $750,000 on or about May 12, 2014

17

into a Panda bank account (the "Panda Account"), for which Williams was the sole signer. Thereafter, STEVEN BROWN, the defendant, diverted a portion of these funds to make payments to a law firm ("Law Firm-1") of which BROWN was a client and BROWN's spouse, among others.

## The Scheme to Defraud Victim-7 and Victim-8

47. In or about the Spring of 2014, as part of the scheme to defraud, Williams and Seppala approached two individuals ("Victim-7" and "Victim-8") about the possibility of investing in Film-4. Based on false representations regarding, among other things, the return on investment Victim-7 and Victim-8 could expect, and the status of the funding for Film-4, Victim-7 and Victim-8 each invested $100,000 in Film-4 and, on or about May 9, 2014, these funds were deposited into the Luxe One Account-2.

48. Neither Victim-7 nor Victim-8 ever received any money in connection with their investment in Film-4 and eventually requested the return of their funds. Despite repeated requests, Victim-7 and Victim-8 never received any of their money back.

49. While Williams and Seppala falsely represented that the funds provided by Victim-7 and Victim-8 would solely be used for the distribution of Film-4, in truth and in fact, these. funds were diverted from the Luxe One Account-2 by STEVEN BROWN,

the defendant, Williams, and Seppala to pay for other expenses not related to Film-4.

## The Scheme to Defraud Victim-9

50.   Between in or about 2016 and in or about 2017, STEVEN BROWN, the defendant, solicited investments by an individual ("Victim-9") in various film projects in which BROWN was purportedly involved.

51.   STEVEN BROWN, the defendant, told Victim-9 that he was involved, along with another individual ("CC-1"), in a company called Special Events Productions, Inc. ("Special Events"), which worked on the production and distribution of films.   BROWN told Victim-9 that Victim-9 was guaranteed to make approximately a 50 % return on investment per year.

52.   Between in or about July 2016 and in or about 2017, in reliance on BROWN's representations, Victim-9 transferred approximately $267,000 to Special Events bank accounts, and also provided an additional $33,000 in cash to invest in Special Events.   Victim-9 understood from STEVEN BROWN, the defendant, that these funds would be used for the production and/or distribution of films.

53.   In or about September 2016, Victim-9 traveled to Manhattan, New York at the invitation of STEVEN BROWN, the

19

defendant. While in Manhattan, BROWN arranged for Victim-9 to meet with Attorney-1, who BROWN represented was involved in BROWN's various film projects, as well as another individual who solicited an investment from Victim-9 in a film in which BROWN purportedly was also investing.

54. Despite BROWN's promise of a 50 % return on investment per year, Victim-9 never received any return on investment in connection with Victim-9's investment in Special Events, and none of the $300,000 that Victim-9 provided to Special Events was ever returned to Victim-9, despite Victim-9 repeatedly requesting the return of his funds from BROWN and CC-1, and BROWN representing that the funds were in the Special Events bank accounts.

55. Furthermore, a portion of Victim-9's $300,000 investment was not invested in film projects, as STEVEN BROWN, the defendant, and CC-1 had promised. Instead, a portion of these funds were used to pay for expenses unrelated to any film projects.

The Scheme to Defraud the Entertainment Agency

56. Beginning in or about 2011 and continuing through in or about 2014, STEVEN BROWN, the defendant, Williams, and Agent-1 engaged in a scheme to defraud Agent-1's employer, an entertainment agency (the "Entertainment Agency") by diverting

funds due and owing to the Entertainment Agency.  BROWN,

Williams, and Agent-1 thereafter shared in these fraudulently

obtained funds.

57.  While Agent-1 was employed by the Entertainment

Agency, the Entertainment Agency was entitled to collect fees

that Agent-1 earned from Agent-1's clients, and Agent-1 was

compensated by the Entertainment Agency with a base salary and

bonus.

58.  However, Agent-1 did not inform the Entertainment

Agency that he was earning fees from one of his clients

("Client-1") in connection with representing Client-1 on a film

project (the "Film Project"), thereby depriving the

Entertainment Agency of funds to which it was entitled.

59.  On multiple occasions between in or about February

2012 and in or about May 2014, invoices were sent to the

producer associated with the Film Project ("Producer-1")

indicating that funds should be wired to the Entertainment

Agency in connection with Client-1's work on the Film Project.

In reality, while the invoices bore the logo and name of the

Entertainment Agency, the invoices did not originate from the

Entertainment Agency and were fake.

60.  In truth and in fact, at the request of STEVEN BROWN,

the defendant, and Agent-1, the fake invoices had been prepared

21

by Williams. Furthermore, the wiring instructions for the
Entertainment Agency provided in the invoices were, in reality,
for bank accounts that Williams had opened with BROWN's
knowledge (the "False Bank Accounts"). The name of the entity
on the False Bank Accounts contained the same initials as the
Entertainment Agency, such that a check or wire transfer made
out to the Entertainment Agency could be deposited in the False
Bank Accounts.

61.  For example, on or about February 21, 2012, the
production company associated with the Film Project wired
approximately $140,000 to one of the False Bank Accounts.  On or
about February 23, 2012, approximately $10,700 was wired from
one of the False Bank Accounts to an account held in the name of
STEVEN BROWN, the defendant (the "BROWN Bank Account").  At the
time of the $10,700 transfer into the BROWN Bank Account, the
BROWN Bank Account had a balance of less than one dollar.  On or
about February 27, 2012, BROWN withdrew approximately $5,610
from the BROWN Bank Account, and on or about February 28, 2012,
Agent-1 deposited a check for approximately $5,600 into Agent-
1's personal bank account.  The memo line on the check indicated
that the payment was related to the Santa Monica Property.
Furthermore, on or about February 29, 2012, BROWN withdrew

approximately \$83.00 from the BROWN Bank Account at an ATM located in Manhattan, New York.

62.    In connection with the preparation and delivery of the false invoices described above, STEVEN BROWN, the defendant, Williams, and Agent-1 engaged in numerous email exchanges to carry out the scheme.

## STATUTORY ALLEGATIONS

63.    From at least in or about 2009, up to and including in or about 2016, in the Southern District of New York and elsewhere, STEVEN BROWN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

64.    It was a part and an object of the conspiracy that STEVEN BROWN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of

23

executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BROWN, Williams, Seppala, and others used interstate phone calls and emails, among other means, to solicit funds from multiple victims, including Victim-1 through Victim-8, based on misrepresentations regarding purported guaranteed returns and profits, the amount of funding BROWN, his co-conspirators, and other investors had already contributed to the film projects, and how the solicited funds were going to be used, among other misrepresentations.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

65. The allegations contained in paragraphs 1 through 62 are repeated and realleged as if fully set forth herein.

66. From at least in or about 2009, up to and including in or about 2016, in the Southern District of New York and elsewhere, STEVEN BROWN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate

24

and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BROWN used and caused others to use interstate phone calls and emails, among other means, to solicit funds from multiple victims, including Victim-1 through Victim-8, based on misrepresentations regarding purported guaranteed returns and profits, the amount of funding BROWN, his co-conspirators, and other investors had already contributed to the film projects, and how the solicited funds were going to be used, among other misrepresentations.

(Title 18, United States Code, Sections 1343, 1349, and 2.)

COUNT THREE
(Conspiracy to Commit Wire Fraud - Victim-9)

The Grand Jury further charges:

67.  The allegations contained in paragraphs 1 through 62 are repeated and realleged as if fully set forth herein.

68.  From at least in or about 2016, up to and including in or about 2017, in the Southern District of New York and elsewhere, STEVEN BROWN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

69.   It was a part and an object of the conspiracy that STEVEN BROWN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BROWN and others used interstate phone calls and emails, among other means, to solicit funds from Victim-9, based on misrepresentations regarding purported guaranteed returns and profits, and how the solicited funds were going to be used, among other misrepresentations.

(Title 18, United States Code, Section 1349.)

COUNT FOUR

(Conspiracy to Commit Wire Fraud – the Entertainment Agency)

The Grand Jury further charges:

70. The allegations contained in paragraphs 1 through 62 are repeated and realleged as if fully set forth herein.

71. From at least in or about 2011, up to and including in or about 2014, in the Southern District of New York and elsewhere, STEVEN BROWN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud in violation of Title 18, United States Code, Section 1343.

72. It was a part and an object of the conspiracy that STEVEN BROWN, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BROWN, Williams,

27

Agent-1, and others used interstate phone calls and emails,.
among other means and methods, to divert funds due and owing to
the Entertainment Agency through fraudulent misrepresentations
and the use of false documents purporting to originate from the
Entertainment Agency but which, in truth and in fact, had been
prepared by Williams at the direction of BROWN and Agent-1.

(Title 18, United States Code, Section 1349.)

COUNT FIVE
(Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

73.    The allegations contained in paragraphs 1 through· 62
are repeated and realleged as if fully set forth herein.

74.    From at least in or about 2009, up to and including
2016, in the Southern District of New York and elsewhere, STEVEN
BROWN, the defendant, and others known and unknown, willfully
and knowingly did combine, conspire, confederate, and agree
together and with each other to violate the money laundering
laws of the United States.

75.    It was a part and an object of the conspiracy that
STEVEN BROWN, the defendant, and others known and unknown, in an
offense involving and affecting interstate and foreign commerce,
knowingly would and did engage and attempt to engage in monetary
transactions in criminally derived property of a value greater

28

than $10,000 that was derived from specified unlawful activity, to wit, the proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1957(a).

76. It was further a part and an object of the conspiracy that STEVEN BROWN, the defendant, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity as defined in Title 18, United States Code, Section 1956(c)(7), to wit, the proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956 (a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## FIRST FORFEITURE ALLEGATION

77. As a result of committing the offenses alleged in Counts One through Four of this Indictment, STEVEN BROWN, the defendant, shall forfeit to the United States, pursuant to Title

29

18, United States Code, Section 981(a)(1)(C) and Title 28,
United States Code, Section 2461(c), any and all property, real
or personal, any and all property, real and personal, that
constitutes or is derived from proceeds traceable to the
commission of said offenses, including but not limited to a sum
of money in United States currency representing the amount of
proceeds traceable to the commission of said offenses that the
defendant personally obtained.

### SECOND FORFEITURE ALLEGATION

78.  As a result of committing the offense alleged in Count
Five of this Indictment, STEVEN BROWN, the defendant, shall
forfeit to the United States, pursuant to Title 18, United
States Code, Section 982(a)(1), any and all property, real and
personal, involved in said offense or any property traceable to
such property, including but not limited to a sum of money in
United States currency representing the amount of property
involved in said offense that the defendant personally obtained.

### Substitute Asset Provision

79.  If any of the above-described forfeitable property, as
a result of any act or omission of the defendants:

(a)  cannot be located upon the exercise of due
diligence;

30

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section2461(c) to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

FOREPERSON

JOON H. KIM
Acting United States Attorney

31

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**v.**

**STEVEN BROWN**

**Defendant.**

### SUPERSEDING INDICTMENT

S6 16 Cr. 436

(18 U.S.C. §§ 1343, 1349, 1956(h) and
2.)

JOON H. KIM
Acting United States Attorney.

A TRUE BILL

Foreperson.

12/7/17   FILED SUPERSEDING INDICTMENT

COTT, USMJ