UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :            16 CR. 436  (KMW)

        -v-            :

STEVEN BROWN,            :

                     Defendant.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AFFIRMATION IN SUPPORT
OF MOTION TO COMPEL**

WALTER MACK, an attorney duly licensed to practice law before the courts of the State
of New York and this court, under the penalties of perjury, affirms and states, based upon my
review of records and upon information and belief, as follows:

       1. I represent the Defendant Steven Brown in the above-captioned matter.  I
submit this Affirmation in support of the Motion to Compel Disclosure of Law Enforcement
Contacts with the So-Called Victims and their Representatives, and for a Possible Evidentiary
Hearing.

       2.  Parallel civil litigations and arbitrations commenced in California involving
similar factual allegations as those set forth in the Superseding Indictment for certain of the so-
called victims have been ongoing for several years  At the same time that discovery in the civil
proceedings was taking place, the criminal investigation that led to the charges in this case was
also occurring.  Unbeknownst to Mr. Brown, he was a target of that criminal investigation.

       3. Certain witnesses in the California civil proceedings, including Victim-2,
Victim-2's counsel and Victim-3 worked closely with and at took actions at the behest of the FBI
and/or the USAO, interacting with them in connection with the criminal investigation.
Furthermore, the investigation involving the films and the persons associated with producing

them, was shopped around and presented to federal and state law enforcement authorities, who declined and discouraged criminal prosecution until the U.S. Attorney's Office of the Southern District of New York agreed to accept it as a criminal case. Unfortunately, inconsistent with its customary practices in white-collar criminal cases--particularly where civil proceedings are involved--the government provided Mr. Brown no opportunity to present his side of the story while, at the same time, accepting and endorsing civil plaintiffs' theories, to Mr. Brown's great detriment.

**Interactions Between the FBI and/or USAO and
the Victims and their Counsel in Parallel Civil Proceedings**

4. Victim-2's counsel in the parallel civil proceedings testified at his deposition on July 9, 2015 that he communicated with the FBI several times – including just days before his own deposition – and with the U.S. Attorney's Office for the Southern District of New York five or six times in the weeks leading up to his testimony in the civil case. Victim-2's counsel testified with respect to his conversations with the FBI and USAO that they asked him questions about what had transpired, the documents that existed and how much money Victim 2 lost. Victim-2's counsel indicated that whenever the FBI or USAO contacted him or requested a meeting, he answered their questions. He also testified that he forwarded various documents to the FBI and USAO. However, without invoking any privilege, Victim-2's counsel steadfastly refused to answer any questions about the substance of what was discussed with the government.

5. Victim-2 himself similarly testified that he had telephone conversations with the FBI and met with them several times. When asked whether the FBI had instructed him not to talk about the criminal investigation at his deposition, Victim-2 refused to answer. In fact,

Victim-2 said he would not answer any questions about his conversations with the FBI, implying that he had been asked not to do so.

6. Likewise, Victim-3 testified at his deposition on July 25, 2017 that he had engaged in conversations with an FBI Agent more than once, though he did not recall how many times they spoke and that he had provided various documents and exchanged emails with the FBI agent, which were not produced in the civil litigation, though requested by the defendants.

7. Similarly, a movie director who worked on projects with Mr. Williams, testified at an arbitration hearing that he had been contacted by the same FBI Agent. Moreover, he admitted that he had failed to mention this fact at his prior deposition.

**The Threats of Criminal Prosecution Made by the So-Called Victims
to Extort Mr. Brown and Others into Paying Civil Settlements**

8. Upon information and belief, Victim-2 warned Mr. Brown that he (Victim-2) could determine who would be criminally charged, and that Mr. Brown had best cooperate in getting Mr. Williams to return Victim-2's money and/or lucrative film rights or face criminal prosecution himself.

9. In an email exchange that took place on May 24, 2014, and was produced by the government, Victim-2 specifically warned Mr. Brown as follows:

> "I want to put this behind me and you guys REALLY need to also because of BIG BROTHER and what part of this don't you understand…"
> "P.S. I can't believe you have implicated [movie producer] in this scam and when it breaks YOU know what will happen to him…"

Mr. Brown responded:

> "[T]hreatening me is a waste of time for me and you."

Victim-2 then stated:

3

> "Steven I really don't know where I threatened you but I am sorry if you feel that way because I AM TRYING TO HELP YOU. That is why you need to get David [Williams] to sign the paperwork and get me those films asap. Talk to you Wednesday…"

Mr. Brown responded further as follows:

> "I am on the side of resolving your partnerships with David [Williams]. It bothers me a lot to think you, someone I admire & consider my friend, would send me the below. I love my country & am sickened by what's going on right now by what I'm reading about the VA & its treatment of veterans. I would love to see "big brother," as you put it, focus on that. Your continual attempt to reference "big brother" is something I had my attorneys look into long ago and "big brother" has no place in a civil settlement. However, I will again double check with my attorneys again, today."

Victim-2 replied with the following cryptic remark:

> "K…Lil Brother."

10. Upon information and belief, Victim-2 went so far as to state he had arranged for the potential criminal case to be presented to prosecutorial authorities in California and Louisiana, respectively, but lamented that both Offices declined to bring criminal charges. Victim-2 then warned Mr. Brown that the USAO in the Southern District of New York was still considering the matter. Upon information and belief, as they spoke, Victim-2 assaulted Mr. Brown by jabbing his finger against Mr. Brown's chest, shoving him backward and promising to ruin his life through criminal prosecution unless he worked to have Mr. Williams return his investment and/or lucrative film rights.

11. Consistent with Victim-2's threats, the law firm representing him sent demand letters and/or commenced lawsuits against various individuals who were ultimately not charged in this case, including a movie producer and two of Mr. Brown's prior attorneys, which carried

4

an implied threat of criminal prosecution if they failed to make payment to Victim-2. For example, in a demand letter to one of Mr. Brown's former attorneys, dated August 23, 2016, coming on the heels of the July 21, 2016 indictment in this case, the law firm noted that it was open to pre-filing settlement discussions and attached a draft civil Complaint explicitly referencing the criminal indictment filed in this case against Messrs. Williams, Brown and Seppala.

12. An earlier demand letter to the movie producer, dated March 1, 2016, was no less threatening in light of the fact that Victim-2's counsel had already testified he was meeting and sharing documents with the FBI and the USAO in connection with its criminal investigation. (See ¶4, supra).

13. Following these implied threats of criminal prosecution intended to pressure these parties into a civil settlement, the movie producer entered into a settlement agreement with Victim-2. Likewise, under the cloud of threatened criminal action, Mr. Brown and others entered into a settlement agreement with Victim-2 in which Mr. Brown agreed to settle not only the amounts demanded against him, but also to settle the claims asserted against one of his former attorneys.

14. Victim-3 also engaged in extortionate conduct, leaving Mr. Brown and his counsel a torrent of intimidating voicemail messages, which prompted Mr. Brown to seek help from his attorney, who sent Victim-3 a cease and desist letter on July 23, 2015. These messages were particularly threatening because, as the letter noted, Victim-3 left many of them in the late evening/early morning hours. Leveraging the criminal action to maximum advantage, Victim-3 commenced a civil lawsuit only weeks prior to the initial Indictment in this case.

15.  When Victim-3 likewise tried to pressure Mr. Seppala, counsel for Mr. Seppala and I met with AUSA Patrick Egan and informed him that the so-called victims were utilizing their relationship with the government to try to obtain favorable civil settlements and requested that he address the matter. I told him that this was potentially extortionate conduct and that the government had a duty to oversee the conduct because civil plaintiffs were implying that the government was supporting their drive for civil money payments.

16.  In the same vein, another purported victim recently added in the Superseding Indictment, Victim-9, initiated a lawsuit against Mr. Brown and others in California Superior Court on July 25, 2017, noting in the civil complaint that Mr. Brown was indicted in New York. Victim-9 similarly tried to use the pendency of the Superseding Indictment to maximum advantage, pursuing settlement talks as recently as 6 weeks ago, at a time when he knew Mr. Brown had been alerted to the fact that Victim-9 might be added to the criminal action. Underlying these discussions was the implied threat Victim-9 would go to the USAO unless Mr. Brown settled the civil claims.

17.  Finally, as part of the document production on August 24, 2017, the government turned over secretly recorded telephone conversations between Victim-2 and Mr. Brown. Victim-2 made these recordings without Mr. Brown's knowledge or consent and in flagrant violation of the California Penal law. What is unclear is the government's role in the creation of these recordings, its level of knowledge, and when it did find out about the recordings what it did to excise the infection of criminally obtained evidence from its investigative work product.

6

18. For the foregoing reasons and the legal arguments in the accompanying memorandum of law, the defense requests that the Court compel production of the following to Mr. Brown's defense counsel:

(i). Documents and information reflecting presentations, directions or declinations of this case by state or federal authorities in California and Louisiana;

(ii). Documents or information setting forth all contacts between law enforcement and the so-called victims and their counsel between January 1, 2009 and July 21, 2016, and

(iii). Documents in the files of the law firm representing Victim-2 that are material to this case, including any exculpatory information, including but not limited to all efforts to enlist law enforcement in support of Victim-2's claims against Mr. Brown, David Williams or Gerald Seppala.

19. Should the Court direct the production of such materials, that defense respectfully requests five business days to determine whether to request an evidentiary hearing on the subject matter.


Dated: New York, New York
December 15, 2017


                                    /s/
                                    _____
                                    Walter Mack, Esq.
                                    Doar Rieck DeVita Kaley & Mack
                                    217 Broadway, Suite 707
                                    New York, New York 10007
                                    212-619-3730
                                    *Attorney for Defendant Steven Brown*

7