# EXHIBIT 3

Page 88

1  Q   Was there a particular reason why you didn't talk
2  to Mr. Williams about the money before you talked to
3  Mr. Riead?
4  A   Can I ask my attorney something?
5      MR. GALE:  Well, then we should go off the record.
6      THE WITNESS:  Off the record.
7      MR. BURGEE:  Well, then just step out for a second.
8      MR. GALE:  Well, if it involved attorneys --
9      MR. BURGEE:  Well, let's just let it roll because I
10 don't think it's going to take long.
11     MR. BURGEE:  Why don't you just step out because
12 stopping and starting is going to take longer.
13     MR. GALE:  Okay.
14     (Pause in proceedings.)
15     MR. GALE:  Can I hear the pending question again,
16 please?
17     THE COURT REPORTER:  Yes.
18     (Record read back by reporter.)
19     MR. GALE:  Okay.  Just one moment.
20     (Pause in proceedings.)
21     MR. GALE:  Okay.  You may answer.
22     THE WITNESS:  The reason I did not talk to
23 Mr. Williams about the money was that I had already talked to
24 the FBI regarding the stealing of my money, and I did not
25 want to tip him off that -- because they were and still are.

Page 89

1  Q   BY MR. BURGEE:  Did you call the FBI yourself?
2  A   I -- that's neither, I mean --
3      MR. GALE:  Calls for a "yes" or "no" or "I don't
4  recall."  Who called who?
5      THE WITNESS:  No.  No.
6  Q   BY MR. BURGEE:  Okay.  You had somebody call on
7  your behalf?
8  A   Yes.
9  Q   Was that your attorneys?
10 A   Yes.
11     MR. GALE:  So, just to clarify --
12     THE WITNESS:  I didn't --
13     MR. GALE:  -- as long as there's no disclosing of
14 the communication, you can answer.
15     THE WITNESS:  Okay.  About my attorney?
16     MR. GALE:  (Indicating.)
17     MR. BURGEE:  Right.
18     THE WITNESS:  All right.  Okay.
19 Q   BY MR. BURGEE:  What I'm not allowed to get into is
20 what you and your attorneys talked to each other about.
21 A   Okay.
22 Q   But if your attorneys did something for you,
23 then --
24 A   Okay.
25     MR. GALE:  Although, arguably, the way he knows

Page 90

1  that is because his attorneys told him so.
2      THE WITNESS:  Yeah.
3      MR. GALE:  We're treading on close to the
4  attorney/client privilege.
5      MR. BURGEE:  Yes.
6      MR. GALE:  So I just want to caution everybody on
7  both sides of the table.
8      MR. BURGEE:  Okay.
9      MR. GALE:  Or all sides of the table.
10     THE WITNESS:  So are we good going on and answering
11 questions?
12     MR. BURGEE:  That's fine.
13 Q   BY MR. BURGEE:  And I asked you about who first
14 contacted the FBI.  What I'm asking -- well, at this point
15 had you personally talked to the FBI?
16 A   What time are we talking about?
17 Q   Is there a point --
18 A   When I came out here to meet Mr. Riead?
19 Q   Well, let's start -- let's keep it before you came
20 out here to meet Mr. Riead.  At some point --
21 A   Yes.  I talked -- I talked to the FBI, yes.
22 Q   Okay.  Did you meet with them in person?
23 A   I have met with them several times, yes.
24 Q   And when did you first meet with them in person?
25 A   It would have been the summer of 2014.

Page 91

1  Q   Before you met them in person, did you have a phone
2  conversation with them?
3  A   Yes.
4  Q   When did you first have a phone conversation with
5  someone from the FBI?
6  A   Probably March or February, March, somewhere around
7  there.
8  Q   March of 2014?
9  A   Yes.
10 Q   Do you remember the name of the agent that you
11 first spoke to?
12 A   Yeah.  I don't know if I can -- yeah.  I do, but I
13 don't think I can disclose that in an open deposition?
14     MR. GALE:  Um --
15     THE WITNESS:  I don't think I --
16 Q   BY MR. BURGEE:  Well, let's go this way:  I don't
17 know if we're disclosing an agent's name.  Let me ask --
18 A   But, yeah.  They're there.
19 Q   Let me go this -- let me ask you this question
20 first -- this might help all of us -- did the FBI ever told
21 you -- tell you not to talk about this matter with anyone?
22 A   No.
23 Q   Did they ever tell you that you shouldn't -- okay.
24 So they never told you not to talk about it, talking to them?
25 A   Talking to David Williams and them, no.

Page 92

1  Q  So they never --
2  A  This is deep.  So, I mean, this is over my head.
3  So I'm sure -- I don't deal with this every day.  So I'm --
4     MR. GALE:  And I need to do some fact checking over
5  the lunch break to find out what you can ask.  So if you can
6  table this until after the lunch break and then --
7     MR. BURGEE:  Sure.
8     MR. GALE:  -- we can have a discussion about it off
9  the record and then go back on the record.
10    MR. BURGEE:  Right.  The reason I was asking about
11 whether anybody from the FBI told him that he can't discuss
12 it, that might be something relevant to your consideration.
13    MR. GALE:  Right and whether they said something to
14 others who were dealing with the FBI is also relevant.
15 That's what I need to find out.
16    MR. BURGEE:  Okay.  So -- okay.
17 Q  BY MR. BURGEE:  So we'll table this for now.
18 A  Okay.
19 Q  And, you know, we'll try to figure out, you know,
20 whether there is any sort of issue here.  I don't know if
21 they -- even if they tell you not to discuss it whether
22 that's a legitimate reason not to be able to testify about
23 it, especially since it could be relevant or definitely
24 relevant to the current suit.
25    MR. GALE:  I don't know -- well, maybe we should go

Page 93

1  off the record, but I don't know about you.  But if the FBI
2  tells me not to do something, I'm going to --
3     MR. BURGEE:  Listen to them.
4     MR. GALE:  Say "yes, sir," or, "yes, ma'am."
5     MR. BURGEE:  Yeah.  I understand.  I understand.
6     MR. GALE:  So I'll find -- I'll try to get some
7  clarity.
8  Q  BY MR. BURGEE:  So where were -- we're back with
9  Mr. Riead.  Okay.  We got kind of sidetracked here because
10 you didn't -- about talking with Mr. Williams.  Okay.  So you
11 talked to Mr. Riead, and then you came out to meet with
12 Mr. Riead in the summer in May or June.  I think that's where
13 we left off before we got sidetracked.
14    Okay.  And by the time you came out to meet with
15 Mr. Riead, did you have any suspicions about him?
16 A  Yeah.  I mean, I didn't know.  So the first two
17 meetings with him I was standoffish, trying to figure out his
18 relationship with David and Steven and Stuart and all of
19 these guys, and I didn't know.  So I was standoffish and then
20 after the second meeting, I felt like he was okay.
21 Q  Okay.
22 A  He was getting screwed, too.
23 Q  So at the time you were -- came out to meet with
24 him, what was the status -- what was going on with "The
25 Letters"?

Page 94

1  A  He was awaiting the P & A funds to fund the P & A
2  for the film and they had hired some people and there was
3  problems getting those people paid, which, obviously, run out
4  of money.  And they had let all those people go.  And let me
5  tell you, this guy -- I'll shut up -- his whole life was in
6  this film is what I'm saying.  So it's horrible what these
7  people did.
8     MR. GALE:  When you say "his whole life," you're
9  referring to Riead?
10    THE WITNESS:  Yes.  Yeah.  Riead's life.
11 Q  BY MR. BURGEE:  Mr. Riead had been working on the
12 film since, what, the year 2000?
13 A  Yes.
14 Q  And he's done nothing else since then?
15 A  Yes.
16 Q  So -- okay.  So Mr. -- so at the time you met with
17 Mr. Riead, he said people weren't getting paid?
18 A  Yes.
19 Q  Do you know if there were any of the promotional
20 marketing people who did not get paid in connection with the
21 letters?
22 A  I don't -- I don't know.  I wasn't --
23 Q  Do you know who was paying the promotional
24 marketing people?
25 A  I don't know.  I don't know.  I really don't.

Page 95

1  Q  Do you know if any -- well, actually strike that
2  for a second.  Let's go back.  You mentioned you froze the
3  bank accounts, the Chase bank accounts.  Was your meeting
4  with Mr. Riead after you froze the bank accounts?
5  A  In the -- yes.  In the summer, yes.
6  Q  So if anybody is getting paid at that point, it's
7  not through the Chase bank accounts, right?
8  A  Right.
9  Q  And do you know if people were paid after you froze
10 the Chase bank accounts?
11 A  I don't know.  I doubt it, but I don't know.
12 Q  Well, again, do you have any reason?
13 A  No.  I don't.
14 Q  Do you know if anybody has made any claim for not
15 being paid for promotional or advertising work?
16 A  I don't know.  That wasn't my deal.
17 Q  Right.  So David Williams was running Luxe One,
18 right, the company that was doing the promotion and
19 advertising?
20 A  I think so, yes.
21 Q  So the bills were being paid through Luxe One?
22 A  I don't know.
23 Q  Okay.
24 A  I really don't know.
25 Q  Well, you put your money into Luxe One?

Page 96

1  A  Yes.
2  Q  And Luxe One --
3  A  And froze the account, okay, and when we froze the
4  account, there was $800,000 in it. Okay?
5  Q  Right, thereabouts.
6  A  Yeah, thereabouts.
7  Q  Did Mr. Williams ever tell you that he had other
8  sources of money available to him to continue the work on
9  "The Letters"?
10  A  I don't know about "The Letters," but he told me
11  that he had all kinds of sources of money.
12  Q  I'm talking about --
13  A  "The Letters" --
14  Q  -- at any time since you froze the bank account did
15  he say that he had other sources of funds?
16  A  No.
17  Q  And when you came out here to meet with
18  Mr. Riead --
19  A  I didn't come out here just specifically just to
20  meet with Riead. I was out here. My wife and I had rented a
21  house in Malibu, and while I was out here, he was here. So
22  we got together.
23  Q  Okay.
24  A  Okay. Anyway, yeah.
25  Q  So you met with him when you came out here in the

Page 97

1  summer of 2014. How many times did you meet with him?
2  A  Actually, at that time, I probably met with him
3  seven or eight times.
4  Q  And what were you meeting about?
5  A  Just "The Letters," what's he going to do, and what
6  can we do or -- because I had money in there and just various
7  and sundry -- those type of things. All I want is my money
8  back. I don't even want any interest. I just want my money
9  back.
10  Q  Okay. And what did Mr. Riead say about -- did he
11  have any sort of plan that would help get you your money
12  back?
13  A  Yes, but I don't know if that plan would have
14  gotten my money back.
15  Q  But did you discuss any sort of plan --
16  A  Yeah.
17  Q  -- to go forward with "The Letters"
18  A  Yes, but we didn't.
19  Q  What plan did you discuss with him?
20  A  Oh. He had a plan of getting some -- he told me
21  that he knew how to release a film, and so he lined up some
22  people to meet with here. And I met with those people. At
23  that time, I had Mark Suroff working for me and helping me,
24  and so Mark came and met with Riead briefly one day. And --
25  but, really, other than just throw a lot of money at

Page 98

1  something, was no real, real good concrete plan. So we
2  bailed. Didn't do it. Remember, I already got a lot of
3  money lost already.
4  Q  Right. I believe a total of $6 million went into
5  "The Letters"?
6  A  Yes.
7  Q  And -- now, 1.75 million was to purchase an
8  interest in the company that owned the film, correct?
9  A  Yes, I think it was. Yes.
10  Q  And do you know if that interest in the film was
11  purchased?
12  A  No. I don't.
13  Q  And did Mr. Riead ever -- did you ever talk to
14  Mr. Riead about the fact that you owned 35 units of the
15  limited partnership?
16     MR. GALE: Excuse me. Can I hear that question
17  back, please?
18     THE COURT REPORTER: Yes.
19       (Record read back by reporter.)
20     MR. GALE: Objection. No foundation as to the word
21  "you" or vague and ambiguous.
22     MR. BURGEE: That's true.
23  Q  BY MR. BURGEE: Let me clarify that for you. Did
24  you ever talk -- okay. Do you know if Luxe acquired 35 units
25  of the limited partnership shares of Big Screen Productions?

Page 99

1  A  I understand that they had. I'm not real sure if
2  they did, but they may have.
3  Q  Did you understand that there was $1.75 million
4  that you were putting up that would go to purchase 35 units
5  of limited partnership interest?
6  A  Yes. I think so.
7  Q  And what was your understanding as to how you would
8  get that money back?
9  A  You know, it's all convoluted now because
10  everything -- I wish I would have gotten my money back. I
11  didn't get it back.
12  Q  Right.
13  A  So I think it would have been in the promotion and
14  exploitation of a film, plus the P & A.
15  Q  Okay. And, by the way, did David Williams ever
16  tell you why Mr. Riead needed an additional 1.75 million in
17  the -- for something other than P & A?
18  A  I thought it was for closing funds or whatever,
19  something.
20  Q  Did you ever hear of the term -- what do they call
21  it -- finishing funds?
22  A  Finishing funds, yeah. Yeah.
23  Q  And my understanding is "The Letters" hasn't been
24  released yet. Do you know of any different?
25  A  I don't think it has either.

Page 100

1  Q   Right.  Now, did David Williams ever tell you that
2  Luxe had purchased the 35 units in the Big Screen Partners?
3  A   Yes.
4  Q   And do you know what ever happened to those 35
5  units?
6  A   No.
7  Q   So, as far as you know, they could still be out
8  there, right?
9  A   Or -- I don't know.  I really don't know.
10 Q   And did you ever ask Mr. Riead whether Mr. Williams
11 actually had gotten those units for Luxe One?
12 A   Yeah.  I -- I think I did.  I think he agreed that
13 he had got 35 units for Luxe One or Big Screen V or whatever
14 it was.
15 Q   Right.  And --
16 A   So, yes, but there's no money--
17 Q   There's something --
18 A   There's no money.
19 Q   Okay.  Yeah.
20 A   Where's the money?  Show me the money.
21     MR. BURGEE:  Do you want to take a lunch break?
22     MR. GALE:  Sure.
23     MR. BURGEE:  I think it's probably a good time for
24 everybody.  I'm getting this feeling.
25     MR. GALE:  Let's go off the record.

Page 101

1     THE VIDEOGRAPHER:  The time is 12:35, and we are
2  off the record.
3       (A lunch recess was taken.)
4     THE VIDEOGRAPHER:  The time is 1:34 p.m., and we
5  are back on the record.
6     MR. BURGEE:  Did we figure out that FBI issue while
7  we were at lunch?
8     MR. GALE:  We did, and I think you can ask your
9  questions and then, depending on the question, we'll see what
10 kind of response we get.
11     MR. BURGEE:  Okay.  Well, let's do it since we're
12 talking about it.
13 *** Q   BY MR. BURGEE:  Do you remember the name of the
14 agent that you first talked to at the FBI?
15 A   No.  I mean, I remember, but I don't think I want
16 to answer.  Huh?
17     MR. GALE:  Well, the witness declines to answer
18 that question.
19     MR. BURGEE:  Okay.  And -- okay.
20     MR. GALE:  On the ground that there's a pending FBI
21 investigation to his knowledge.  I don't know if you want to
22 ask more questions.
23 Q   BY MR. BURGEE:  Yeah.  So let's get that on the
24 record.  So, Mr. Busbice, you don't feel comfortable
25 answering that question, right?

Page 102

1  A   Right.
2  Q   So let's get it out there as to why you don't feel
3  comfortable about that.  To your knowledge, is there an
4  ongoing FBI investigation?
5  A   Um --
6     MR. GALE:  It's up to you.  You can answer or not
7  answer.
8     THE WITNESS:  I would rather not answer.
9  *** Q   BY MR. BURGEE:  And, now, is this -- is there
10 somebody from the FBI who told you you shouldn't talk about
11 this?
12 A   I really don't want to answer.
13 Q   But, you know, one of the reasons we want to get
14 this out there because if we want to, we might go talk to a
15 judge about it.  And if the judge says, you know, that
16 Mr. Busbice can talk about this then --
17 A   All right.
18 Q   So we want to make sure -- you know, your attorney
19 and I want to make sure that we understand --
20 A   Right.
21 Q   -- what we're going to be talking to the judge
22 about and so if we -- I suppose your attorney can file a
23 declaration on this or something if he gets some better
24 information on this.
25     MR. GALE:  Don't bring me into this.  These are

Page 103

1  your questions.
2     MR. BURGEE:  I know, but if I have to go in front
3  of the magistrate and say, "Well, gee.  There's a line of
4  questioning here that got shut down because of the FBI
5  thing" --
6     MR. GALE:  The witness is answering to the best of
7  his ability and based on his conscience and ask away.
8     MR. BURGEE:  Okay.
9  Q   BY MR. BURGEE:  Okay.  Mr. Busbice, are you willing
10 to tell me about any of your conversations with the FBI?
11 A   No.
12 Q   So, just to shortcut it, so it doesn't matter what
13 I ask about the F -- any conversation you might have had with
14 them, you're not willing to answer that?
15 A   Right.
16 Q   Okay.  And if I have an issue, I'll talk to your
17 attorney?
18 A   Okay.
19 Q   Your attorney will talk to you.  If we have to go
20 talk to the judge, we'll go talk to the judge and, you know,
21 figure it out.
22 A   Okay.
23 Q   And if the judge then says something, then I guess
24 we go with what the judge says.
25 A   Oh.  Yeah.  Yeah.

Page 104

1  Q   Okay.  Now, from the beginning of this morning, I
2  think you've said that the letters were the second project
3  that you got involved with involving Mr. Williams?
4  A   Yes.
5  Q   And how did -- well, when did -- when did that
6  project first come to you?
7  A   It happened in my first trip out here to L.A., and
8  he brought it up and said he had a film, "The Letters," that
9  was about Mother Teresa.  And being from South Alexandria, I
10 knew about Mother Teresa.  I'm not Catholic, but I knew about
11 her.  And so I said, "That sounds pretty good."  And he said,
12 We can do it for 2 million -- you put in two.  I've already
13 put in my two, and I've got this other group Chart
14 Investments V or XII that would be willing to put in --
15 they've already put in six.  I put in my two -- I need your
16 two.  All right."  That's the kind of the way it began and --
17 Q   Okay.  And that first trip was back in -- shoot.
18 A   I know.
19 Q   Some part of 2013?
20 A   Yeah, probably early somewhere late, late spring --
21 Q   Right.
22 A   -- 2013.
23 Q   And the money that was being put into "The
24 Letters," was that P & A money?
25 A   Yes.  Yes.  P & A, yes.

Page 105

1  Q   Okay.  Mr. Williams told you he had some other
2  investor as well?
3  A   Yes.
4  Q   And what was their name?
5  A   Chart Investment XII, I believe.  He --
6  Q   Did you talk about, you know, how you were going to
7  structure this investment in terms of forming an entity to do
8  it?
9  A   I think we did, yes.  We formed an entity or he had
10 an entity or something that we just used.
11 Q   Right, and that entity was what?  Luxe One?
12 A   I think it was Luxe One, yes.  So many -- Luxe One,
13 Legacy and just those, I think.  Yes.
14 Q   Do you know an individual by the name of Mark
15 Taylor?
16 A   No.  I do not.  I --
17 Q   Do you know if you were made a officer or a
18 director of Luxe One?
19 A   No.  I don't.
20 Q   Did Mr. Williams ever tell you that he was going to
21 make you vice president of the company?
22 A   He may have.  May have.  I mean, I just don't
23 remember.  He may have though.  Was I?  You probably know.  I
24 mean, I don't know.
25 Q   Okay.  And anybody ever tell you you were going to

Page 106

1  be a director of the company?
2  A   I don't remember.
3  Q   Did you ever have any meetings of the board of
4  directors of Luxe One?
5  A   No.
6  Q   Or shareholder meetings?
7  A   No.
8  Q   Did you ever have a in-person or telephonic meeting
9  that involved Mark Taylor?
10 A   No.
11 Q   Did you ever speak to anybody from Chart?
12 A   Let me explain:  Chart, I don't think, exists.
13     MR. GALE:  Just answer his question.  The answer
14 is --
15     THE WITNESS:  No.
16 Q   BY MR. BURGEE:  Okay.  Did you ever receive any
17 e-mails from anybody from Chart?
18 A   No.
19 Q   Or I should say they claimed they were from Chart?
20 A   I don't recall receiving anything from them.
21 Q   Have you personally done anything to investigate
22 who is behind Chart?
23     MR. GALE:  Objection.  No foundation.  You can
24 answer.
25     THE WITNESS:  Okay.  On the Internet I've looked

Page 107

1  and looked and looked and looked and never found them at all,
2  none of them, Mark Taylor or Chart Investment XII.
3  Q   So you've heard the name Mark Taylor before
4  somewhere?
5  A   Yeah.  Yeah.  I don't know him.  I don't know if he
6  exists.
7  Q   Right.
8  A   I think he was on the documents or something
9  from -- David said that was Chart's documents.  I forget,
10 but --
11 Q   Right.  And -- when did you look on the Internet to
12 see if you could find Mark Taylor or Chart?
13 A   Probably in the fall of 2013.
14 Q   When did you put in the -- you first put money into
15 "The Letters"?
16 A   Probably -- it would have been June or July 2013
17 somewhere in there, maybe August.
18 Q   Okay.  Sometime during the summer of 2013?
19 A   Probably there, right.  Right.
20 Q   And your initial investment into "The Letters" was?
21 A   2 -- 2 million.
22 Q   2 million.  Okay.  When was the next time you put
23 more money into "The Letters"
24 A   It was December 31st, 2013.
25 Q   How much did you put in in December?