UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

UNITED STATES OF AMERICA       :
                        :

        - v. -           :         16 Cr. 436 (KMW)
                        :

STEVEN BROWN,           :
                        :

                 :

           Defendant.    :

                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Katherine Reilly
Noah Solowiejczyk
Ryan Finkel
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 1

   I.    The Offense Conduct ...................................................................... 1

   II.   Other Releant Conduct ................................................................... 10

   III.  Procedural History ........................................................................ 10

   IV.  The Applicable Guidelines Range ................................................ 12

DISCUSSION ........................................................................................................ 13

   I.    A Sentence Between 51 and 63 Months is Warranted in this Case.................................. 13

   II.   Brown's Arguments For a Sentence Below 51 to 63 Months Are Unavailing................ 21

   III.  The Defendant's Sentence Should Include Full Restitution to His Victims.................... 29

CONCLUSION ....................................................................................................... 30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

        - v. -        :        16 Cr. 436 (KMW)

STEVEN BROWN,        :

        Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM

The defendant is scheduled to be sentenced in this matter on November 16, 2017 at 3:00 p.m. The Government respectfully submits this memorandum in advance of that sentencing. For the reasons set forth below, neither the term of 15 months' imprisonment suggested by Brown, nor the term of 30 months' imprisonment recommended by the Probation Office, is sufficient to appropriately vindicate all of the 3553(a) factors. The Government respectfully submits that a sentence within the range of 51 to 63 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing.

## **BACKGROUND**

### I.    **The Offense Conduct**

Brown participated in a long-running conspiracy to defraud multiple victims of more than $12.5 million. Over the course of approximately eight years, Brown and his co-conspirators solicited investments in film projects by making misrepresentations and material omissions in their interactions with potential investors, including about guaranteed returns, money already committed, and the roles Brown and his co-conspirators were themselves to play in the films.

(PSR ¶ 10).

### A. Victim-1

In 2009, a Victim-1 was introduced to Brown in connection with the development of a feature film ("Film-1"). (PSR ¶ 11). Brown told Victim-1 that his co-conspirator, James David Williams, owned a company which could assist with distributing Film-1, including committing substantial funding. (*Id.*). At the time he made these representations, Brown had a longstanding relationship with Williams. In part as a result of what Brown told Victim-1, Victim-2 and two other investors put their own money into Film-1. (*Id.*). Williams subsequently provided a letter to Brown, which was passed on to Victim-1, indicating that his company would commit between $8 million and $12 million to the distribution of Film-1. (PSR ¶ 12). Once the filming of Film-1 was complete, Victim-1 sought to move forward with the promised efforts toward distribution; over the course of several months, Brown and Williams repeatedly and falsely told Victim-1 that Williams was working toward distribution of Film-1. (PSR ¶ 13). In December 2010, in a meeting Brown had helped arrange but which he failed to attend at the last minute, Williams told Victim-1 he would commit a substantial, though significantly lower, amount of money to distributing Film-1. (*Id.*) In truth and in fact, however, neither Williams nor his company ever put any funds into the marketing or distribution of Film-1. (PSR ¶ 14). Neither Victim-1, nor any of the other victims he had recruited in reliance on Brown's and Williams's promises, recouped their investments in Film-1.[1] (*Id.*).

Notably, during the same period in which Victim-1 was working on Film-1 and acting as a producer of Film-1, Brown solicited a $75,000 investment in Film-1 by an additional victim,

---

[1] In seeking a significantly below Guidelines sentence, Brown points to his work on "faith-based or religious-themed stories," claiming credit for several movies, including Film-1. Given that Brown used Film-1 as a vehicle to defraud multiple victims, and the work of distributing

2

Victim-E.  (PSR ¶ 14).  Victim-1 never learned of Victim-E or his investment in Film-1, and

Victim-E received only a partial return of the funds he had invested, and only then after initiating

civil litigation against Brown.  (*Id.*).

In the summer of 2009, while Film-1 was being shot and before Victim-1 learned about

the lies Brown and Williams told in connection with Film-1, Brown approached Victim-1 about

investing in a second feature film ("Film-2").  (PSR¶ 15).  Once again, Brown represented that

Williams's company was investing a substantial amount of money in Film-2, this time in the

film's production.  (*Id.*).  Indeed, Victim-1 was provided with copies of two letters from

Williams to Brown and others that contained false statements about Williams's prior work and

claimed that the company had already dedicated between $500,000 and $750,000 to Film-2, as

well as claiming that Williams's company would guarantee other investments in Film-2 up to

$650,000, with repayment within one year.  (PSR¶ 16).  Williams and Brown then both

participated in a meeting with Victim-1 and other investors he brought in, in which both

Williams and Brown indicated that Williams's company had already put money into Film-2.

(PSR ¶ 17).  In truth and in fact, neither Williams nor his company had made any such

investment, a fact which Brown, as one of two co-signers on the Film-2 bank account, was in a

position to know.  (PSR ¶¶ 18, 20).  Nevertheless, in reliance on Williams's and Brown's

fraudulent claims, Victim-1 and two other investors invested a total of $300,000 in Film-2.  (PSR

¶ 18).

While Film-2 was being shot, Brown and his co-conspirators continued their fraud on

Victim-1.  One such co-conspirator showed Victim-1 a document that purported to show that

Williams's company had, in fact, invested in Film-2.  (PSR ¶ 19).  Meanwhile, Brown told

Film-1 fell largely to Victim-1 in the absence of the funds promised by Brown and Williams, it
seems far-fetched at best to credit Brown for the dissemination of the film's message.

Victim-1 that state tax credits received in connection with Film-2 would be used, in part, to pay back investors or to complete post-production on the film.  (PSR ¶ 21).  None of the victims ever received any of this money, and Victim-1's efforts to move post-production of Film-2 along only provided an opportunity for Brown to tell further lies.  (*Id.*)  Indeed, Brown told Victim-1 that if Victim-1 invested an additional $65,000 in the post-production of Film-2, Brown himself would also invest $65,000.  (*Id.*)  Not only did Brown never make any such investment, but a significant portion of the $65,000 invested by Victim-1 was misappropriated by Brown.  (*Id.*)

Victim-1 never received any of the money he had invested in Film-2 back, nor any return on his investment.  (PSR ¶ 22).  In addition, Victim-1 repaid the other two investors he had brought into the movie out of his own pocket.  (*Id.*).

Brown's efforts to mislead investors in Film-2 were not confined to Victim-1 and the investors he brought into the film.  (PSR ¶ 22).  Four additional investors in the film, who invested a total of more than $550,000 in the film, also lost their money.  (*Id.*)

B. *Victim-2*

In or about April 2013, Brown and his co-conspirators were introduced to Victim-2, a wealthy businessman.  In seeking funds from Victim-2, Brown and Williams deployed a modus operandi similar to that they had used several years earlier with Victim-1.  Specifically, Brown, Williams, and Gerald Seppala falsely represented to Victim-2 that Williams would invest $500,000 in the making of a documentary film ("Film-3"), if Victim-2 also invested $500,000.  (PSR ¶ 25).  Brown, in fact, told Victim-2 that this was a "smaller amount" for Williams, knowing full well that Williams did not, in fact, make investments of this or any size in film productions.  (*Id.*).  To further convince Victim-2 to invest, Williams, with the knowledge of Brown and Seppala, prepared false financial documents purporting to show that Williams had

wired $500,000 into an account for Film-3. (PSR ¶ 26). Brown, Williams, and Seppala also told Victim-2 that an entity called Woodlawn Holdings, LLC ("Woodlawn Holdings") would guarantee Victim-2's investment, when, in reality, Woodlawn Holdings was a fictional entity. (PSR ¶ 27). Based on these false representations, Victim-2 invested $500,000 in Film-3. (PSR ¶ 28). A substantial portion of these funds were used to pay the personal expenses of Brown, Williams, and Seppala, including to fund the purchase by Brown of a condo in Santa Monica, California. (PSR ¶ 29).

A few months later, in June 2013, while Victim-2 believed Film-3 was in production, Williams approached Victim-2 about investing in another feature film ("Film-4"). (PSR ¶ 30). Williams made several misrepresentations about money invested by his own company and a fictional third party entity in Film-4; Brown was aware that Williams was soliciting this investment from Victim-2 and was doing so based on fraudulent misrepresentations. (PSR ¶¶ 30-32). As a result of Williams's misrepresentations, Victim-2 wired $2 million to an account controlled by Williams, which he believed was an investment in Film-4. (PSR ¶ 33). A substantial portion of these funds was used to pay for the personal expenses of Brown and Williams; for example, $530,000 was transferred to an account to which both Brown and Williams had access and used to pay personal expenses and make withdrawals. (PSR ¶ 34).

In September 2013, Williams approached Victim-2 seeking an investment in the marketing and distribution of another film ("Film-5"), claiming that he'd invested $2 million of his own money in Film-5 and sending Victim-2 and his attorney what purported to be a screenshot of a bank account to which Williams's investment had been transferred. (PSR ¶ 39). As a result, Victim-2 transferred $2 million to Williams for investment in Film-5. (PSR ¶ 40).

The money was for the most part used to pay personal expenses, including for Brown.  (PSR ¶ 42).

In November 2013, almost immediately after Victim-2 invested in Film-5, Williams, in consultation with Brown, again approached Victim-2 about investing money in Film-4, claiming that both Williams and the fictional third party would each be putting in more money.  (PSR ¶ 35).  Williams, acting with Brown's knowledge, sent Victim-2 and Victim-2 attorney fraudulent bank statements and cancelled checks purporting to show that the additional money had already been invested in Film-4.  (PSR ¶ 36).  In reliance on these representations, Victim-2 transferred an additional $4 million to an account controlled by Williams.

In February 2014, more than nine months after Victim-2 made his initial investment in Film-1,  Brown provided—after repeated requests from Victim-2—a disc containing footage that had purportedly been shot for the film.  (PSR ¶ 43).  In fact, the disc constituted in large part of publicly available footage, and Film-3 was never completed or released.  (*Id.*).  As 2014 progressed, Victim-2 continued to request more information about his various "investments" and was provided fictitious account documents by Williams, posing as an accountant.  (PSR ¶ 44). Both Brown and Williams attempted to assuage any concerns Victim-2 might have had, first claiming that they could not share certain materials due to confidentiality concerns and then, in an in-person meeting, showing him a fraudulent screenshot purporting to show a substantial balance remaining in one of the relevant accounts.  (PSR ¶ 45).  Victim-2 ultimately requested that his money be returned; it never was.  (PSR ¶ 46).

### C.  Victim-3

In April 2014, Brown and Williams approached Victim-3 about investing in another film ("Film-6").  (PSR ¶ 47).  Once again, Brown and Williams made misrepresentations about how

Victim-3's money would be used and what funds had been contributed by other investors; based on those misrepresentations, Victim-3 agreed to invest $500,000 in the production of Film-6. (*Id.*). In September 2014, Brown and Williams falsely represented to Victim-3 that they would make a substantial investment in Film-6 and proposed that Victim-3 provide $500,000, which would be fully guaranteed by Woodlawn Holdings and eligible to be repaid, with interest, after the year. (PSR ¶ 48). In response to inquiries from Victim-3's attorney, Williams and Brown sent Victim-3 fraudulent financial documents; for example, Brown provided what purported to be a current bank statement for an account belonging to Woodlawn Holdings. (PSR ¶¶ 50-51). Based in part on these representations, Victim-3 wired an additional $500,000 for investment in Film-6. (PSR ¶ 52). When Victim-3 attempted to exercise his rights under the guarantee, he was unable to get his money back. (PSR ¶ 53).

### D. Victim-4

In 2012, Seppala introduced Brown and Williams to Victim-4, sending them a screenplay for a film ("Film-7") Victim-4 had written. (PSR ¶ 55). Brown represented to Victim-4 that he would invest $75,000 in making Film-7 if Victim-4 matched that investment; the combined sum of $150,000 was to be used to secure a commitment from Williams to contribute millions of dollars toward distributing Film-7, with the portion of the fee paid by Victim-4 to be "fully coupable," plus interest, "no later than March 1, 2013." (PSR ¶¶ 56-57). As a result of these representations, Victim-4 deposited $75,000 into an account controlled by Wiliams. (PSR ¶ 58). In reality, Brown never contributed any money to that account and, to the contrary, Williams wired $35,000 of Victim-4's money into an account controlled by BROWN and $10,000 into an account controlled by Seppala. (*Id.*). When Film-7 had not begun production after more than one year, Victim-4 demanded the return of his $75,000 investment.

(PSR ¶ 59). Despite the guarantees provided by Brown – both in a written contract and orally – that Victim-4's $75,000 would be fully recoupable with five percent interest, neither Brown, Williams, nor Seppala promptly returned the money. (*Id.*) It was only after Victim-4 repeatedly threatened to file a lawsuit, that the co-conspirators used other victims' funds to repay Victim-4. (*Id.*).

### E.  Victims-5 and 6

In 2014, Williams and Brown solicited a $750,000 investment in a feature film ("Film-8") from Victim-5 and Vicitm-6, a husband and wife. (PSR ¶ 60). In doing so, Williams falsely claimed that an entity Williams controlled had already invested $3 to $4 million into the distribution of Film-8 and told Victim-5 and Victim-6 that they would receive a 15% return on their investment. (*Id.*). After Victim-5 and Victim-6 wired the funds into an account controlled by Williams, Williams caused a portion of these funds to be paid to a law firm that represented Brown and to Brown's spouse, as payments on Brown's behalf. (PSR ¶ 61). Victim-5 subsequently agreed to invest an additional $500,000 in Film-6, in return for, among other things, a five percent ownership interest in the film. (PSR ¶ 62). Williams and Brown told Victim-5 that the additional investment was guaranteed by Woodlawn Holdings. (PSR ¶¶ 62-63). Indeed, on or about September 10, 2014, Brown sent an email to Victim-5 attaching a purported Woodlawn account statement – the same statement sent to Victim-3 – showing substantial assets. (PSR ¶ 63). The account statement was fake; the account, like Woodlawn itself, did not exist. (*Id.*).

### F.  Victims-7 and 8

In April 2014, Seppala identified Victim-7 to Brown and Williams as a possible investor in Film-4. (PSR ¶ 64). Based on false representations similar to those made to other victims of

the scheme, Victim-7 invested $100,000 in Film-4. (*Id.*). The following month, Seppala approached Brown and Williams about soliciting funds from Victim-8, an acquaintance of Victim-7. (PSR ¶ 65). In or about July 2014, after Williams suggested in an e-mail communication that investments in Film-4 had closed, Brown confirmed to Seppala that "[w]e are good to go to accept the [Victim-8] dollars." (*Id.*). Shortly thereafter, based on false representations about Film-4 similar to those made to Victim-7, Victim-8 invested $100,000 in Film-4. Neither Victim-7 nor Victim-8 ever received any of their money back, despite repeated requests; their funds were, in fact, diverted to pay the expenses of Brown, Williams, and Seppala. (PSR ¶¶ 66-67).

### G. Victim-9

Brown, Williams, and Seppala were arrested in connection with the instant case in June 2016. Brown was subsequently released on bail; the personal recognizance bond on which he was released was co-signed by Victim-9, an acquaintance of Brown's. Between July 2016 and in or about 2017, while he was released on bail in connection with the charges pending in this case, Brown solicited investments from Victim-9 totaling approximately $300,000, based on false representations Brown made regarding a company with which he was purportedly involved that handled the production and distribution of films. (PSR ¶¶ 68-70). Brown told Victim-9, among other things, that Victim-9 was guaranteed to make approximately a 50% return on investment per year. (PSR ¶ 69). During this same period, Brown agreed to classify a debt owed to Victim-9 by a co-conspirator as an additional "investment" in the company of $93,000. (PSR ¶ 72). Despite Brown's promise of a 50% return on investment per year, Victim-9 never received any return on investment in connection with his investment and none of the funds were returned.

(PSR ¶ 73). Furthermore, a portion of the invested funds were not, in fact, invested in film projects as promised; instead, those funds were used to pay unrelated expenses. (PSR ¶ 74).

## II. Other Relevant Conduct

In 2011, after Brown and Williams had defrauded Victim-1 but before they had been put in contact with Victim-2, Brown and Williams concocted a separate fraudulent scheme, working alongside an agent at an entertainment agency ("Agency-1"), Stuart Manashil. (PSR ¶ 75). Working together, Brown, Manashil, and Williams stole commissions due to Agency-1 as a result of work done for a client ("Client-1") and diverted those commissions to an account controlled by Williams, from which it was used to pay the personal expenses of both Brown and Williams. (*Id.*) To effectuate this scheme, Williams opened a bank account in the name of an entity with a name similar to that of Agency-1 and, acting at the direction of Brown and Manashil, prepared invoices purporting to be from Agency-1 to be sent to a producer ("Producer-1").[2] (*Id.*) The scheme continued through in or about 2014. This scheme, which predated much of the conduct charged in the instant case, included many of the same elements of Brown's and Williams's later conduct, including the preparation of false documents to effectuate the scheme.

## III. Procedural History

_____

[2] Attached as Exhibit 1 to the Government's sentencing submission, for example, is a June 6, 2013 e-mail chain in which Manashil forwarded an exchange with Client-1 and Producer-1, telling Brown, who had no affiliation with Agency-1, "We got to invoice." Brown then forwarded this e-mail to Williams, who was also unaffiliated with Agency-1, presumably to prepare a fake invoice, which Williams then did. Similarly, attached as Exhibit 2, is a May 1, 2014 e-mail exchange between Brown and Manashil in which Manashil writes, "Pal need that invoice done[,]" and Brown responds, presumably referring to Williams, "He is doing it. I'll press him now[.]" Again, neither Brown nor Williams had any association with the Agency-1, and thus there would be no reason for them to be involved in preparing any invoices for Agency-1. The invoices that were prepared by Williams and sent to Producer-1 were made to appear as if they originated from Agency-1, when in reality they had been created by Williams at the direction of Brown and Manashil to effectuate the scheme.

Brown was initially indicted, along with James David Williams and Gerald Seppala, on June 22, 2016, and the Indictment was unsealed following Brown's arrest on June 28, 2016. The initial indictment described a scheme to defraud four victims, and charged one count of conspiracy to commit wire fraud, one count of wire fraud, and one count of conspiracy to commit money laundering. (Dkt. No. 1). Williams pleaded guilty to a Superseding Information on or about June 21, 2017, (Dkt. No. 95), pursuant to a cooperation agreement with the Government. Williams' plea was not sealed. On or about December 5, 2017, Seppala pleaded guilty to a superseding Information charging the misdemeanor offense of conspiracy to commit bank larceny. (Dkt. No. 120).

A superseding Indictment was filed against Brown on December 7, 2017 (the "Superseding Indictment"). (Dkt. No. 124). The Superseding Indictment expanded the scope of the charged conduct, adding references to five victims of Brown's fraud, including Victim-9 who had been defrauded by Brown from 2016 to 2017, after Brown had already been indicted in this case. In addition, the Superseding Indictment charged a new wire fraud count involving the scheme to defraud the entertainment agency, discussed above. (*Id.* at ¶ 56-62).

On or about January 29, 2018, Brown moved to dismiss the Superseding Indictment. (Dkt. Nos. 159-164). In his motion to dismiss, Brown claimed, among other things, that the Government sought to "attribute to Mr. Brown . . . the purported scheme to defraud perpetrated by David Williams." (Dkt. No. 161, at 1). On March 15, 2018, the Court heard oral argument on the motion to dismiss and denied the motion from the bench. (Dkt. No. 195).

On or about March 30, 2018, Stuart Manashil pleaded guilty pursuant to a one count superseding Information charging conspiracy to commit wire fraud in connection with his role in

the scheme to defraud the entertainment agency.  Manashil pleaded guilty pursuant to a

cooperation agreement with the Government, and his plea was not sealed.

On April 5, 2018, only 11 days before trial, and 10 days after the Government provided

its marked exhibits and witness list to the defense, Brown pleaded guilty, pursuant to a plea

agreement, to a superseding information (the "Superseding Information"), S9 16 Cr. 436

(KMW), charging him with one count of conspiring to commit wire fraud from in or about 2009

up to and including in or about 2017, in violation of Title 18, United States Code, Section 1349.

Brown's plea was accepted by this Court the following day.

## IV.        The Applicable Guidelines Range

The plea agreement and the PSR are in accord with respect to the calculation of the

Guidelines Range, with the exception of the inclusion of a specific enhancement, as set forth

below.

The November 1, 2016 Guidelines Manual applies to Brown's offenses.  See U.S.S.G.

§ 1B1.11.  The base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).  A 20-level increase is

warranted pursuant to U.S.S.G. § 2B1.1(b)(1)(K) because the loss amount at issue was between

$9,500,000 and $25,000,000.  Because the defendant has clearly demonstrated acceptance of

responsibility, a three-level reduction is warranted, pursuant to U.S.S.G. § 3E1.1(a) and (b).  As

a result, as set forth in the plea agreement, the total offense level is 24.  The PSR, however, has

added a two-level enhancement because the offense involved more than 10 victims, pursuant to

.S.S.G. § 2B1.1(b)(2)(A)(i), resulting in a total offense level of 26.[3]  (PSR ¶¶ 88-98).

---

[3]        The Probation Department's inclusion of this enhancement is, presumably, based on the
list of victims entitled to restitution that was furnished to Probation by the Government.  The full
list of victims affected by the fraudulent scheme and entitled to restitution under the Mandatory
Victim Restitution Act is based, in part, on information developed or better understood by the
Government following the defendant's plea.  The Government, however, continues to believe

Brown has zero criminal history points; his Criminal History Category is I. Accordingly, the Guidelines Range set forth in the plea agreement is 51 to 63 months' imprisonment; the Guidelines Range set forth in the PSR is 63 to 78 months' imprisonment, (PSR at 44).

## **DISCUSSION**

In light of the nature and circumstances of the instant offense, and the history and characteristics of the defendant, a sentence of between 51 and 63 months' imprisonment is appropriate in this case.

**I.    A Sentence Between 51 and 63 Months is Warranted in this Case.**

*A.    A Guidelines Sentence is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Impose Just Punishment.*

1.    Brown's Fraud Was Brazen and Spanned Approximately Eight Years

Steven Brown's conduct in this case is nothing short of egregious. Beginning in at least 2009 and continuing through 2017, Brown and his co-conspirators stole over $12.5 million from numerous victims – nine of which are identified in the Superseding Indictment and the Superseding Information – in the course of carrying out a scheme to solicit purported investments in film projects based on misrepresentations regarding, among other things, funding already received from other investors and promised guaranteed returns. Brown's lies and deceit had serious and lasting consequences for his victims – consequences that they are still dealing with to this day and will continue to deal with for years to come. The seriousness of Brown's offense militates heavily in favor of a sentence of 51 to 63 months' imprisonment.

Brown's conduct was not the result of a single, isolated lapse in judgment. Rather, for a period spanning approximately eight years, Brown worked hand in hand with James David

---

that a sentence in the range of 51 to 63 months' imprisonment, as calculated in the plea agreement, is appropriate in this case.

Williams and others to defraud investor after investor in purported film projects. During that time, Brown and Williams intentionally lied to their victims about many things, including how much money had been invested in their projects and what the investors' money would be used for. Notably, when Brown was arrested in this case, he continued committing fraud, not with Williams, but with other, uncharged co-conspirators.

The use of fake documents and fictional entities in connection with the fraud perpetrated by Brown and Williams makes this crime a particularly brazen one. During the years and years that the fraud continued, there are countless examples of Brown and Williams using fake documents and fictional entities to lure their victims to hand over their funds. (*See, e.g.,* PSR ¶¶ 19, 26, 27, 36, 39, 44, 45, 51, 63). One particularly egregious example arises from the lengths that Brown, Williams, and Seppala went to induce Victim-2 to provide $500,000 in connection with Film-3. Brown, Williams and Seppala informed Victim-2 that Williams had already invested $500,000 in the project and that Victim-2 would be matching this investment with his own $500,000 investment. (PSR ¶ 25). None of this was true. Brown, Williams, and Seppala knew that Williams did not intend to invest $500,000 in Film-3. (*Id.*). Victim-2's counsel requested documentation showing that Williams had, in fact, invested $500,000 into Film-3 before Victim-2 would make his own $500,000 investment. A fake wire transfer confirmation showing the $500,000 being transferred from Williams was provided to Victim-2, as well as a fake bank account screenshot showing a balance in the account reflecting this purported $500,000 transfer. (*Id.* ¶ 26).

The use of fake documents did not end there. In order to further convince Victim-2 to invest in Film-3, Brown, Williams and Seppala informed Victim-2 that an entity called "Woodlawn Holdings LLC" would be providing a guarantee of Victim-2's $500,000 investment

in Film-3.  Documents purporting to show a balance sheet for Woodlawn were provided to Victim-2 and Victim-2's counsel prior to Victim-2 investing in Film-3.  In reality, Woodlawn Holdings was a fake entity and the balance sheet was a sham.[4]

It further bears noting that Brown himself personally lied to multiple victims about his own purported investments in film projects in order to induce these investors to hand over their money.  For example, Brown told Victim-1 that if Victim-1 put in $65,000 into Film-2, Brown would himself invest $65,000 in order to allow for the completion of post-production work on Film-2.  (PSR ¶ 21).  Victim-1 transferred $65,000 into a bank account associated with Film-2 as a result.  At the time of the transfer, the balance in the account was approximately $239.  Brown never deposited the promised $65,000 into the account.  Brown diverted a significant portion of this $65,000 provided by Victim-1 to himself in order to pay for personal expenses.  (*Id.* ¶ 21).  Similarly, Brown informed Victim-4 that Brown would invest $75,000 into Film-7 if Victim-4 invested the same amount.  Brown claimed this $150,000 would be used as a fee to hold a prints and advertising commitment with an entity controlled by Williams.  (PSR ¶ 57).  Victim-4 deposited $75,000 into the Highgate Pass Account.  Records for the Highgate Pass account further show that Brown never transferred any of his own money into that account, and that the

---

[4]     While Williams prepared the fake Woodlawn documents, Brown was the one to provide them to several victims.  *See* (PSR ¶¶ 51, 63).  Additionally, Brown suggested he could arrange a guarantee through Woodlawn and made representations about dealings with Woodlawn even separately from the charged conduct (and, in some cases, from Williams).  On one occasion, for example, Brown suggested in proposing a guarantee through Woodlawn that Woodlawn was "a team of largely ex bankers," and "[a]s a result[,] we have some choices."  *See* Ex. 3 to the Government's sentencing submission.  On another, Brown shared with a business associate that Woodlawn was in the business of rehabilitating dilapidated properties and "getting paid out and turning over the tax-free asset to the non-profit entity," telling the associate that Woodlawn "have done quite well in real estate & with us."  *See* Ex. 4 to the Government's sentencing submission.  Of course, in reality, Woodlawn as presented to investors and to the associate did not exist and had done no business with Brown or Williams whatsoever.

day after Victim-4 transferred his funds into the account, Williams wired $35,000 of the money into an account controlled by Brown. (PSR ¶58).

What also makes the fraud committed by Brown and Williams so brazen, and the conduct so serious, is that a very significant portion of the funds provided by victims were diverted to pay the personal expenses of Brown, Williams, and others. This money was not used for anything bearing even the faintest relationship to the production or distribution of purported film projects. In other words: Brown and his co-conspirators simply stole the money. This makes Brown's fraud particularly egregious. It is certainly a crime to make material misrepresentations in order to get an investor to commit their funds, even if the defendant, after that point, uses the money largely in the fashion that was promised. But that is not *this* crime. This crime is materially different. Here, Brown and Williams, after making outsized promises of significant return on investment to their victims, took the majority of the money and largely spent it on themselves. And the money that Brown caused to be stolen exceeded $12.5 million, approximately at least $1,123,028 of which flowed directly to Brown, to accounts he controlled, or that were used for his benefit. This conduct is unacceptable and the punishment imposed must reflect that.

For example, the Government has determined based on a tracing analysis that approximately $400,000 of Victim-2's invested funds were used by Brown to finance Brown's purchase of a condominium from Stuart Manashil (another co-conspirator in Brown's fraud on Agency-1). Funds belonging to Victims 5 and 6, a husband and wife, were also used by Brown to further finance the purchase of the condominium.

Brown and Williams' fraud, at times, resembled a Ponzi scheme. By way of example, after Victim-4 began to demand his $75,000 back from Brown, Williams, and Seppala, and eventually threatened to file suit, Brown, Williams and Seppala used funds, some of which they

had just received from Victim-2, purportedly for a film investment, in order to pay back Victim-4. Victim-2, not surprisingly, had not authorized that his funds be used for this purpose.

The seriousness of Brown's offense conduct is underscored by the fact his fraud continued even after he was indicted in this case and even after Brown had ceased working with Williams. Between approximately 2016 and 2017, Brown solicited approximately $300,000 from one of his own bail bond co-signers (identified as Victim-9 in the Superseding Indictment and the PSR). Once again, despite having already been indicted in this case and having been sued civilly by multiple victims, Brown promised Victim-9 guaranteed returns of at least 50 percent per year. (PSR ¶ 69). Despite Brown's promises, Victim-9 never received any return on his investment. Victim-9 repeatedly demanded the return of his funds, but never received any of those funds back from Brown or his co-conspirator. (PSR ¶ 73). The fact that Brown continued to commit fraud even after being arrested and charged in this case speaks volumes about the brazen and egregious nature of this conduct.

### 2. The Impact on Victims

The loss figure reflected in the plea agreement and in the PSR of in excess of $12.5 million is not a figure based on intended loss. Brown's conduct caused actual losses of at least this amount. The loss amount attributed to Brown does not overstate the harm in this case. To the contrary, it reflects the havoc and destruction that he wrought in the lives of those who were deceived by Brown and his co-conspirators to "invest" hundreds of thousands of dollars, and, in certain instances, millions of dollars. None of these investors ever saw any of the outsized returns that had been promised by Brown and his co-conspirators. Indeed, with a few exceptions, none of these investors have ever gotten a single dime of the initial money they provided back. Those who did manage to receive any of their funds back either threatened suit,

or went through with filing suit and recovered a percentage of their invested funds back only after expending significant time and money pursuing their legal claims (and, in some cases, using their own time and resources in order to attempt to get the films in question on track, produced, and released). In that respect, the financial loss in this case also understates the seriousness of the offense because it does not include the costs imposed upon Brown's victims arising from their involvement in years of civil litigation. Victim-3,[5] for example, describes in his victim impact statement that, in addition to the $500,000 he invested with Brown, he had to expend costs associated with initiating and pursuing civil litigation in an effort to get his funds back, as well as hundreds of hours of his time.

Of course, the financial costs are only one aspect of the harm caused by Brown's fraud. Victim-3 describes how he "suffered significant emotional pain and anguish" in the aftermath of Brown's fraud. Victim-2 – who lost millions of dollars that he had "earned . . . from years of hard work" – was in a "constant state of disbelief, anxiety and disorientation" after realizing that he had been the victim of an elaborate fraud orchestrated by Brown and Williams. As Victim-2 describes, the fraud has caused him to "have trouble trusting people" and has led to "bouts of serious depression." All of this should be considered by the Court in assessing the extremely serious nature of this offense.

In sum, a sentence between 51 and 63 months' imprisonment is necessary to sufficiently address the seriousness of this offense and to promote respect for the law.

B. *Deterrence and Protection of the Public*

---

[5] Victim-3 identifies himself as "Victim-2" in his victim impact statement. A key of the victims' names and corresponding victim identifier is included on the last page of the PSR.

The imposition of a sentence between 51 and 63 months' imprisonment is also necessary to deter the defendant from future crimes and to adequately protect the public. Here, such a sentence is necessary to ensure both specific and general deterrence.

With respect to specific deterrence, Steven Brown has demonstrated that such deterrence is necessary in light of his conduct. *First*, and most significantly, even after Brown had been arrested, indicted, and released on bail, Brown continued to engage in fraud in connection with his supposed work on film projects. With respect to Victim-9, it is absolutely stunning that Brown – even after his indictment – would continue to solicit hundreds of thousands of dollars in investments in connection with film projects based on promises of guarantees and enormous returns. That Victim-9 handed over $300,000 of his money to Brown and his co-conspirator (who was not either James David Williams, Gerald Seppala, or Stuart Manashil), and received none of that money back, despite repeated demands that the money be returned, is entirely unsurprising given Brown's history of running cons in connection with his work on supposed film projects. The fact that the defendant continued to commit crimes while on bail demonstrates that he is not a man who is easily deterred from engaging in criminal activity – specifically, fraud – and this is a factor that this Court should consider in fashioning an appropriate sentence. Brown's continued fraud while on bail weighs heavily in favor of specific deterrence, particularly where, as here, the post-arrest criminal conduct was (i) extremely serious and involved a fraud of over $300,000 and (ii) involved the exact same sort of conduct for which Brown had already been indicted. Courts in this Circuit have appropriately recognized that specific deterrence is necessary under such circumstances. *See, e.g.*, *United States v. Marsh*, 820 F. Supp. 2d 320, 348 (E.D.N.Y. 2011) ("specific deterrence is of particular concern for this defendant, since [the defendant] continued to participate in fraudulent activity similar to the

[indicted] scheme while released on bail for this offense.").

*Second*, specific deterrence is necessary because it is clear that the defendant has not fully taken ownership for the extent of his role in this conduct, as well as the disastrous effect his conduct had on his victims. While the Government believes based on everything currently before it that Brown will have done enough to meet the conditions for acceptance of responsibility under U.S.S.G. § 3E1.1[6], Brown has continued even after pleading guilty to not fully own up to his conduct. This is reflected in the Probation Office's recommendation, which specifically notes that Brown "is having a difficult time coming to grips with involvement in the instant offense" and has repeatedly sought to focus on the fact that James David Williams is, in his view, more responsible for the fraud. (PSR at page 45). As Probation appropriately notes, "while James Williams may have profited more than the defendant, this does not lessen the loss Brown is to be held accountable for causing the victims." (*Id.*).

Furthermore, certain of the objections raised by Brown to the PSR indicate that he has not fully come to terms with the extent of his role in the offense. For example, Brown objects to paragraph 23 of the PSR, which states in pertinent part that "most of the money provided by Victim-2 was not used for the purpose for which it was solicited, and was instead diverted for the personal use of Brown, Williams and Seppala." (PSR ¶ 23). Brown's response to this paragraph is as follows: "the vast majority of the funds invested by Victim-2 was not received by Mr. Brown but was invested in the movies in question or received by Williams and Williams entities." (PSR at page 36). This is not borne out by the evidence. While it is certainly true that

---

[6] The Government, of course, reserves the right to modify its position with respect to whether U.S.S.G. § 3E1.1 applies in light of anything additional that the Government may learn prior to sentencing, or in light of any positions that Brown or his counsel may take in connection with the sentencing proceeding.

James David Williams received far more of Victim-2's money than Brown, what the evidence shows it that (i) exceedingly little of Victim-2's money was actually spent on the purported film investments[7] and that (ii) Brown received a significant portion of this money for himself. For example, the Government has determined that approximately $400,000 of Victim-2's funds were utilized by Brown to make a payment to Stuart Manashil towards Brown's purchase of a condominium.

Brown's efforts to cast blame on others for his conduct and minimize his own conduct is particularly troubling when considering whether he may re-offend. These statements suggest that the defendant does not fully understand the repercussions of—and his responsibility for—his own illegal conduct, increasing the likelihood that he re-offends.

Moreover, the defendant was in his late thirties and mid forties during the time period of his offense, and if he receives only the 15 month sentence he seeks will still be in his late forties when he is released. Particularly in light of the fact that the defendant's crimes are not violent or physical and instead involve false statements, misrepresentations, and fictitious documents, none of which become more difficult to make with age, the public must be protected from his conduct, and he must be specifically deterred. These goals would be sufficiently accomplished with a sentence between 51 and 63 months' imprisonment.

Finally, with respect to general deterrence, it is important that those who might choose to engage in brazen fraud of the sort that occurred here, particularly a fraud that resulted in the loss of millions of dollars, be sent a clear message that such conduct will not be tolerated and will

---

[7]     James David Williams, who is cooperating with the Government, would testify to the same. Financial records – all of which were provided to Brown in discovery and which were marked as exhibits in preparation for trial and provided to defense counsel – show that the vast majority of Victim-2's money was simply stolen.

result in stiff punishment. The defendant's request for a sentence of 15 months' imprisonment would not adequately vindicate this 3553(a) factor. Moreover, such a sentence would result in unwarranted sentencing disparities given the brazen nature of this fraud, and the extensive actual (not intended) losses that resulted from Brown's conduct.

## II.     Brown's Arguments For a Sentence Below 51 to 63 Months Are Unavailing

Brown asks that the Court impose a substantially below Guidelines sentence of 15 months' imprisonment. While Brown certainly brings certain information to the Court's attention that is relevant to the Court's sentencing determination and appropriately considered under Section 3553(a), Brown's arguments in favor of such a lenient sentence are ultimately unpersuasive and should be rejected by the Court. Furthermore, Brown's sentencing submission is more notable for what it does not say than it what it does. Almost entirely absent from Brown's submission is any actual discussion of the serious nature of the offense to which he pleaded guilty.

### A.  *The Loss Amount is an Accurate Representation of the Harms Caused*

Brown argues that the Guidelines, which are driven by the loss amount in fraud cases such as this one, are not based on careful study or empirical evidence and should, thus, be discarded. (Def. Mem. at 21-25).

In support of this argument, Brown cites to a series of cases, practically none of which bear any factual resemblance to this case. In particular, many of the cases cited in the defendant's submission involve loss calculations based on *intended* loss. *See, e.g., United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013) (remanding because "[t]he District Court did draw a comparison between other financial crimes and this case, but it never resolved the question raised by the appellants—whether treating intended loss like actual loss under all the circumstances of this case

leads to a sentence consistent with the dictates of section 3553(a).").  This is not a case where the loss amount is based on an intended loss that was never realized.  Nor is this a case where the defendant received no gain or only a minimal gain from his participation in the offense.  Here, the loss calculation was determined based on *actual* losses that accrued to multiple victims, an incredibly important distinction.  Accordingly, the loss amount in this case is a fair proxy for the harm caused by the defendant's conduct.  That actual harm, which goes even beyond the massive financial losses, is laid out in detail in the PSR and in the victim impact statements.

Among other cases, the defendant relies upon *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012).  (Def. Br. at 22).  There, the defendant, having been convicted of securities fraud offenses, faced a Guidelines range driven by illegal gains in excess of $15 million, a substantial portion of which he "did not share in [in] any direct sense."  *Gupta*, 904 F. Supp. 2d at 351-53.  This case is wholly distinct from *Gupta*.  Based on the Government's analysis, at least $1,123,028 of victim funds flowed directly to Brown, to accounts he controlled, or that were used for his benefit.  Accordingly, nothing about this case suggests that a deviation from the Guidelines is appropriate.  *See United States v. Qualls*, 25 F. Supp. 3d 248, 259 (E.D.N.Y. 2014) (considering *Gupta* and imposing a 14-point Guidelines enhancement based on loss amount "[g]iven the nature of the victims, the amount of loss here, as well as the impact of the loss on the victims[.]").  Moreover, as set forth above, the financial loss in this case, if anything, understates the harm—tangible and intangible—suffered by the defendant's victims.

Accordingly, Brown's argument that "the 'loss' table in this case inappropriately drives the Guidelines beyond a reasonable sentence for Steven J. Brown" (Def. Mem. at 25) is unavailing because it fails to account for the fact that Brown – unlike many of the defendants in

the cases he cites to – caused actual losses in the millions and personally profited in excess of $1 million from the offense.

### B. Brown's Crime Was Not an "Isolated Mistake"

Brown further argues that because he is a non-violent, first-time offender he should receive only a sentence of 15 months' imprisonment. (Def. Mem. at 32). While it is certainly true, as the defense states, that "courts have varied from the calculated Guidelines range for defendants who were first-time offenders and who had led otherwise decent lives," (Def. Mem. at 32), many of the cases that Brown cites in support of this proposition are, once again, not analogous. For example, in *United States v. Hadash*, 408 F.3d 1080 (8th Cir. 2005), the defendant was a "law abiding citizen who [did] an incredibly dumb thing" when he stole six semi-automatic handguns that were in storage, used some of the guns for target practice, gave one to a neighbor, sold one to his girlfriend's son, and immediately confessed when questioned. *Id.* at 1081. By contrast, Brown's offense spanned approximately eight years and impacted numerous victims. Brown did not make one or two isolated mistakes. Moreover, Brown did not confess or accept responsibility upon discovery of his crimes; rather, his criminal conduct continued even post-Indictment and his plea came on the eve of trial, only after the Government had identified the very exhibits and witnesses it intended to use to make its case and two of his closest co-conspirators had pleaded guilty pursuant to cooperation agreements. These facts make Brown's case a far cry from the defendants in any of the cases he cites to in support of his bid for leniency.

### C. The Defendant's Family Circumstances Do Not Support A Non-Guidelines Sentence

In his sentencing submission, Brown also argues that "consideration of Steven Brown's family circumstances supports a non-Guidelines sentence." (Def. Mem. at 33). Brown primarily

cites to the close relationship he has with his two nieces, one of whom just started college.[8]

While the Government has no reason to doubt that Brown has a close relationship with his

nieces, that relationship does not provide a basis upon which to impose a non-Guidelines

sentence. There is no assertion that Brown is the primary caretaker for his nieces or that they are

otherwise dependent, financially or otherwise, on him. Brown's relationship with his nieces is

distinguishable from the defendant in *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 WL

2329290, at *2 (S.D.N.Y. Jun. 5, 2008), who had 6 children of his own that relied on him. The

other cases the defendant cites to are similarly inapposite. *See, e.g., United States v. Dominguez*,

296 F.3d 192, 194 (3d Cir. 2002) (district court erred in saying it could not depart 4 levels for

bank fraud defendant who lived with elderly parents who were physically and financially

dependent on the defendant); *United States v. Antonakopoulous,* 399 F.3d 68, 82 (1st Cir. 2005)

(defendant was a caretaker for brain-damaged son).

Because Brown is not a caregiver nor an actual source of required financial support for

his nieces, providing a lower sentence on these grounds is inappropriate. *Cf. United States v.

Smith*, 331 F.3d 292, 294 (2d Cir. 2003) (finding that a downward departure based on family

circumstances was not justified where the defendant "was not the sole caregiver or financial

supporter of his son" and noting that "[i]t is not unusual…for a convicted defendant's

incarceration to cause some hardship in the family."); *United States v. Nivar*, No. 02 Cr. 382

(RWS), 2003 U.S. Dist. LEXIS 10865, at *11, (S.D.N.Y. June 26, 2003) ("[f]amily ties and

---

[8] Brown references that his nieces depend on him for emotional and financial support. This claim regarding financial support is impossible to square with the assertion by Brown, only pages earlier in his sentencing submission, that his "present financial condition and immediate financial outlook are poor as he carries sizable credit card debt and owes substantial amounts in legal fees and personal loans." (Def. Mem. at 17). Brown also owes the victims of his crimes millions. Brown will not be a source of any financial support to his nieces for quite some time, nor does it appear that he has been capable of being a source of financial support for them for many years, given his own financial condition.

responsibilities are not 'ordinarily relevant in determining whether a sentence should be outside the guidelines,' 18 U.S.S.G. § 5H1.6, but if family circumstances are extraordinary, they can be considered by the court in making a downward departure.") (citing *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991); *United States v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir. 1990)).[9]

### D.  Brown's Charitable Works Do Not Support a Non-Guidelines Sentence

In further support of his request for a sentence of fifteen months' imprisonment, Brown cites to a variety of charitable works that he has been involved in. Defense counsel claims in their submission that "Steven Brown's charitable works truly have been extraordinary."  (Def. Mem. at 34).  While the Government does not doubt that Brown has been involved to some degree with support of a number of charitable causes, if the Court closely scrutinizes this section of the defendant's sentencing memorandum and the accompanying letters, the Government respectfully submits that they are relatively short on details, and that there is nothing to support Brown's claim that his involvement in charitable work is "extraordinary."  Very little is provided by way of specifics with respect to how much Brown may have donated to these various causes, or the number of hours he actually devoted to charitable work.  It also bears noting that it is the Government's understanding that Brown also did paid lobbying work in the past, which included work for Labor causes.

---

[9]      Indeed, even in cases where a defendant is the primary caretaker for small children, lengthy sentences have been imposed.  For example, in a recent case before Judge Failla, the mother of a newborn child who had engaged in a wire fraud offense resulting in a loss amount between $550,000 and $1,500,000 and involving only four victims received a sentence of 24 months' imprisonment.  *See United States v. Arvanitakis,* No. 15 Cr. 457 (KPF), Dkt. No. 161 (S.D.N.Y. 2018).





*F.   Brown's Request for a Non-Guidelines Sentence In Order to Continue to Allow Him To Work on Film Projects Should Be Rejected*

Brown also seeks to use his supposed marketing of additional film projects that he is purportedly in the process of working on as a basis to receive a lenient sentence.  While Brown makes vague claims in his sentencing submission that he "believes" the marketing of these films "could generate between $1.5 million and $5 million" and that these funds "would go primarily to the victims of this case," (Def. Mem. at 38), no specifics whatsoever are provided.  Brown's illusory promises of the millions he will earn from his work on film projects – particularly in light of his history of promising large returns that never materialized in connection with the very crime to which he has pleaded guilty to – warrants no weight whatsoever from this Court in

rendering its sentence.[12]  Brown has had years to pay back the victims of his crimes and "make amends for his conduct," as he puts it. (Def. Mem. at 38).  Nearly none of the victims have received any funds back to date whatsoever.  Brown's belated attempt to hold out his work on supposed film projects as a basis for him to remain at liberty should, accordingly, be rejected.  That Brown would even advance such an argument in light of the crimes for which he has now admitted his own guilt only further demonstrates that he has not fully come to terms with the seriousness of his own offense.

## III.  The Defendant's Sentence Should Include Full Restitution to His Victims.

This Court should impose restitution as set forth in the PSR, (PSR at page 44), in order to attempt to compensate the victims of the defendant's fraud.  In yet another effort to avoid the full consequences of his actions, the defendant "objects that the restitution figure proposed by the Government is excessive for this particular defendant, given his role in the criminal conduct and the number of identified victims agreed to as part of the plea agreement."  (PSR at page 43).

The Guidelines provide that a sentencing court shall, in cases such as this one that arise under the appropriate statutory provisions and involve "an identifiable victim," "enter a restitution order for the full amount of the victim's loss."  U.S.S.G. § 5E1.1.  The restitution figures set forth in the PSR represent careful consideration of the "full amount of the victim[s]

---

[12]  Since in or about the time of the filing of the Superseding Indictment, Brown has been subject to the additional bail condition that "[a]ny funds resulting from the defendants participation in the sale of any films or . . . the defendant's participation in the solicitation of any funds for any film-related purposes shall be placed into an escrow account, and remain in said escrow account pending trial, with notice and associated documentation provided to pretrial services."  (Dkt. No. 140).  The Government has spoken to Brown's pretrial services officer, and to date Brown has never provided any such notice or associated documentation to his pretrial services officer.

loss[es]" in this case, including the provision, as appropriate, of "credits against loss,"[13] as described in Application Note 3(E) to U.S.S.G. § 2B1.1.[14]  Accordingly, the full $12,696,508 restitution amount should be imposed, which liability is, with respect to all of the victims save Victim-9 and Victim-E, joint and several with James David Williams, and with respect to certain other victims also joint and several with Gerald Seppala.  (*See* PSR at page 51).[15]

---

[13]     Brown references in his submission that he has "already made a $600,000 payment to one of the victims in this case." (Def. Mem. at 17).  Brown does not accurately describe the circumstances surrounding this payment, and the Government has not credited this amount against the loss.  In reality, after Victim-2 threatened to bring a civil suit against Stuart Manashil for claims arising from Manashil's role in Victim-2's investment in fraudulent films, Manashil reached out to Brown and sought to have Brown pay the costs of settling any claim.  Brown caused funds to be provided that were used to satisfy Victim-2's claims against Manashil.  Thus, even if Brown was responsible for providing the funds that financed the payment, this payment was not made by Brown, it was made by Manashil to settle claims that Victim-2 threatened to assert against him.  Moreover, the payment was to compensate Victim-2 for Manashil's civil liability with regard to the scheme, not for Brown's, and was not directly tied to any losses incurred.

[14]     The defendant may, of course, seek to modify the order of restitution imposed here should recovery be made down the road, and this Court is satisfied that the requirements of the statute are met.  See, e.g., United States v. Yalincak, No. 05 Cr. 111 (JBA), 2015 U.S. Dist. LEXIS 145153, at * 2-3 (D. Conn. Oct. 26, 2015) (discussing repeated modifications of a restitution order in light of funds recovered through bankruptcy or related proceedings).

[15]     The Government has ninety days following the date of sentence to provide the Court with full information concerning the victims and the amount of restitution owed to each of them.  See 18 U.S.C. § 3664.  The Government intends to submit a proposed restitution order soon after sentencing.  The Government is also preparing a proposed final order of forfeiture that it plans to submit prior to sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of 51 to 63 months' imprisonment is appropriate in this case and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
November 9, 2018

<div style="margin-left: 50%;">

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: _____/s/_____

Katherine Reilly
Noah Solowiejczyk
Ryan Finkel
Assistant United States Attorneys
(212) 637-6521/2473/6612

</div>